UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

**NICK'S GARAGE, INC.,**

                       Plaintiff,

    v.

**PROGRESSIVE CASUALTY INSURANCE COMPANY;
NATIONAL CONTINENTAL INSURANCE COMPANY;
PROGRESSIVE ADVANCED INSURANCE COMPANY;
PROGRESSIVE DIRECT INSURANCE COMPANY;
PROGRESSIVE MAX INSURANCE COMPANY;
PROGRESSIVE NORTHERN INSURANCE COMPANY;
PROGRESSIVE PREFERRED INSURANCE COMPANY;
and PROGRESSIVE SPECIALTY INSURANCE COMPANY**

                       Defendants.

                       Defendants.

**RESPONSE TO
STATEMENT OF
MATERIAL FACTS AND
STATEMENT OF
ADDITIONAL MATERIAL
FACTS IN DISPUTE**

Civil Action No: 5:12-cv-777
(MAD/DEP)

---

       Plaintiff Nick's Garage, Inc. ("Plaintiff" or "Nick's"), in opposition to Defendants' motion for summary judgment and pursuant to Local Rule 7.1(a)(3), hereby responds to Defendants' Statement of Material Facts (the "Statement") and sets forth its own Statement of Additional Material Facts in Dispute as follows:

**The Parties**

       *1.    Plaintiff, Nick's Garage, Inc., is a corporation that operates an auto body shop known as Nick Orso's Body Shop in Syracuse, New York.  See Am. Compl. ¶ 1 (Sept. 23, 2013) (ECF No. 35).*

       **RESPONSE:** Nick's **ADMITS** the statements contained in Paragraph 2 of the Statement, and Nick's additionally asserts that the full assumed name of Nick's Garage, Inc. is

"Nick Orso's Body Shop and Service Center".   Declaration of Michael Orso, dated October 10, 2014 ("Orso Decl."), ¶1, Ex. A

2.     *Michael Orso is the President of Nick's Garage, Inc. and owns the property where Nick Orso's Body Shop is located.  See 30(b)(6) Dep. Tr. Of Nick's Garage, Inc. ("Nick's Dep.") 43:10-14, attached to the Declaration of Kymberly Kochis in Support of Defendant's Motion for Summary Judgment ("Kochis Decl."), Ex. "A".*

**RESPONSE:** Nick's **ADMITS** the allegations contained in Paragraph 2 of the Statement, subject to the correction regarding the name set forth in the Response to Paragraph 1.

3.     *Each of the Defendants is an insurance company engaged in the business of selling auto insurance policies in New York.  See Answer to Am. Comp. ¶ 10 (Oct. 23, 2013) (ECF No. 39).*

**RESPONSE:**  Nick's **ADMITS** the facts in Paragraph 3 of the Statement.

## Procedural History

4.     *The operative complaint, Plaintiff's Amended Complaint, was filed on September 23, 2013. Am. Compl. (ECF No. 35).*

**RESPONSE:** Nick's **ADMITS** the facts in Paragraph 4 of the Statement.

5.     *Progressive timely filed its Answer and affirmative Defenses on October 23, 2013. Answer to Am. Compl. (ECF No. 39).*

**RESPONSE:** Nick's **ADMITS** that Defendants timely filed their Answer and affirmative defenses on October 23, 2013.

6.     *Plaintiff asserts it is the assignee of 29 claims by 26 First Party Assignors, all of whom were Progressive insureds.  Am. Compl. ¶¶ 11, 16 (ECF No. 35).*

**RESPONSE:** Nick's **ADMITS** the facts in Paragraph 6 of the Statement.

2

7.      *Plaintiff asserts it is the assignee of 11 claims by 11 Third Party Assignors, all of whom were involved in a motor vehicle accident with Progressive insureds and are therefore Progressive "claimants." Am. Compl. ¶¶ 11, 19 (ECF No. 35).*

**RESPONSE:** Nick's **ADMITS** the facts in Paragraph 7 of the Statement.

8.      *Plaintiff's Amended Complaint asserts breach of contract causes of action on behalf of 29 First Party Assignors.  As three of the First Party Assignors have two claims, there are 26 unique First Party Assignors. Am. Compl. ¶ 16 (ECF No. 35).*

**RESPONSE:** Nick's asserts that the phrase "on behalf of" is ambiguous.   Nick's **ADMITS** that Plaintiff asserts breach of contract causes of action as the assignee of 26 unique First Party Assignors, who collectively assigned to Plaintiff a total of 29 separate insurance claims giving rise to breach of contract actions.  Compl. ¶¶11-14, 38-44; Orso Decl. Ex.G & H. Nick's **DENIES** the assertions in paragraph 8 to the extent they are inconsistent with the forgoing, on the basis of the citations cited in this response.

9.      *Plaintiff purports to assert a cause of action for violation of General Business Law §349 ("GBL § 349") on behalf of 18 First Party Assignors (or 21 First Party Claims), and 11 Third Party Assignors (or 11 Third Party Claims). See Am. Compl. ¶¶ 38-57, 48 (ECF No. 35).*

**RESPONSE:** Nick's asserts that the phrase "on behalf of" is ambiguous. Nick's brought a GBL §349 cause of action asserting that Defendants violated GBL 349 by engaging in unfair claims practices and arbitrarily and improperly refusing to pay amounts with respect to 32 different instances of repairs, on behalf of 18 First Party Assignors and 11 Third Party Assignors. Comp. ¶¶48-55.  In addition to bringing the GBL 349 action as assignee, Plaintiff also brought the GBL 349 cause of action for Plaintiff's own injury, in Plaintiff's own right rather than just as

assignee.  Compl. ¶56; Compl. ¶45-57.  Nick's **DENIES** the assertions in paragraph 9 to the extent they are inconsistent with the forgoing, on the basis of the citations in this response.

10.     *All of the damages sought in relation to the 21 First Party Claims for GBL 349 are identical to the damages sought for these First Party Assignors' breach of contract claims. See Am. Compl. ¶¶ 11, 16, 37-44, 48 (ECF No. 35).*

**RESPONSE**: Nick's **DENIES** the facts in Paragraph 10 of the Statement because Plaintiff has also sought attorney fees pursuant to GBL 349 which are not part of the breach of contract actions.  Compl. ¶¶44, 57

### Progressive's Policy with the First Party Assignors

11.     *Progressive's policy with every First Party Assignor in this litigation contains the following language concerning payment for repairs: [Quoted policy provision omitted]*

**RESPONSE**:  Plaintiff **ADMITS** the facts in Paragraph 11.

12.     *Progressive's Policy with each First Party Assignor in this litigation also contains an appraisal clause that addresses the First Party Assignors rights if they are dissatisfied with the amount that Progressive has determined is reasonable under the Policy to return the vehicle to pre-loss condition: [Quoted policy provision omitted]*

**RESPONSE**: Nick's **DENIES** the assertions in Paragraph 12 to the extent Defendants' are asserting the process set forth in the quoted provision is the policy holder's exclusive remedy. Nothing in the provision quoted makes the remedy provided therein exclusive. *See* Statement ¶12; Kochis Decl. Ex. A; Declaration of Cecelia RS. Cannon, dated October 10, 2014 "Cannon Decl." Ex. I.  Except as set forth in the preceding sentence, Nick's **ADMITS** the facts in Paragraph 12.

**Estimating Process**

13.     When a loss occurs, Progressive advises its customers that they have the right to bring their vehicles to the automobile body repair shop of their choice.  See Dep. Tr. Of Corey Lee taken on Mar. 19, 2014 ("Lee Dep.") at 153:7-13, Kochis Decl. Ex. "C".  All of the Assignors in this litigation took their vehicles to Plaintiff for the repair of their vehicles. See Am. Compl. ¶¶ 14 (ECF No. 35).

**RESPONSE**:  Nick's **ADMITS** the facts in Paragraph 13 of the Statement.

14.     When Plaintiff's customers drop their vehicle off for repairs, Plaintiff has the customers sign a Designated Representative Authorization form.  See Dep. Tr. Of Larry Zaleppa taken on Mar. 14, 2014 ("Zaleppa Dep."), at 93:4-7, Kochis Decl. Ex. "D".  Although Plaintiff acknowledges that it is required by law to get customer authorization if the cost to repair a vehicle increases from what was originally estimated, Plaintiff believes that this Authorization form allows it to later increase the amount of its estimate without notifying the customer. Nick's Dep. 121:2-5, Kochis Decl. Ex. "A".

**RESPONSE**:  Nick's **DENIES** the assertions in Paragraph 14 of the Statement for the following reasons.

First, to the extent Defendants are asserting that Nick's *requires* its customers to sign the Designated Representative Authorization form, Nick's **DENIES** the same.  Rather, Nick's offers customers the option of having the shop negotiate directly with the insurer on the customers' behalf with respect to the repairs.  Not all customers elect to make Nick's their designated representative. For those customers who do not, the customer is responsible for any negotiations with the insurer. Orso Decl.¶¶ 74;75

Indeed, the citation in the Statement to Larry Zaleppa's deposition does not contain any such testimony.  *See* Statement, ¶14, *citing*  Dep. Tr. of Larry Zaleppa taken on March 14, 2014 ("Zal. Dep.") at 93:4-7.   At the cited point, Mr. Zaleppa was not even talking about the designated representative form, but instead was answering questions about assignments of rights. Zal. Dep. 93:4-7.  The assignment form and the designated representative form are two separate forms with separate legal implications.  Deposition of Michael Orso, taken on February 28, 2014 ("Orso Dep."), 24:11-23; Zal. Dep. 91:2-24   (attached to Declaration of Cecelia R.S. Cannon, dated October 10, 2014 as Exs. K & L.

Plaintiff **DENIES** that it relies on the Designated Representative Form as authorization to supplement its original estimate; this authorization is actually provided by the Authorization and Guidelines to Repair form.  Orso Decl. ¶69 , Ex. D.

15.   *In addition to the Designated Representative Authorization form, Plaintiff asks its customers to sign an assignment of rights form.  The assignments are signed by the customers before repairs have begun on the customers' vehicles. Nick's Dep. 36:5-20, Kochis Decl. Ex. "A".*

**RESPONSE:**  Nick's **DENIES** the statements in Paragraph 15 of the Statement.  Nick's *offers* customers an opportunity to assign the customer's claims against the insurer in exchange for Nick's agreeing not to pursue the customer for the deficiency, which the customer would otherwise be obligated to pay to Nick's.  Orso Decl. ¶70.  The customer has a choice whether to accept this offer or not.  *Id.*

16.   *The First Party Assignors sign an "Authorization for Assignment of Claim and Proceeds."  This assignment only assigns Plaintiff the right to sue Progressive for property damage relating to the Assignors' motor vehicles.  First Party Authorizations, Kochis Decl. Ex. "E".*

**RESPONSE:** Nick's **ADMITS** that each of the First Party Assignors in this case signed an Authorization for Assignment of Claim and Proceeds ("Assignment") and **ADMITS** that the First Party Assignors did not assign any bodily injury component of their claims to Plaintiff.

Nick's **DENIES** any implication that the scope of the assignment is limited only to claims for the value of property damage and **DENIES** any implication that it does not include GBL 349 claims, and further asserts that the interpretation of the Assignment is a question of law and not appropriate for a statement of facts, but directs the Court to the language assigning to Plaintiff "All right and claim . . . that has or will have accrued on such claims". *See* Orso Decl. Ex. G.

17.    *The Third Party Assignors sign two different assignments:  "Assignment of Property Damage Claim Only" and "Authorization for Assignment of Claim and Proceeds." Third Party Authorizations, Kochis Decl. "F"; and Third Party Assignments, Kochis Decl., "G".*

**RESPONSE:**  Nick's **ADMITS** that the Third Party Assignors in this case signed the two referenced forms, but **DENIES** any implication that all third party claimants who bring their cars to Plaintiff for repairs sign those forms.  Orso Decl., ¶70.

18.    *The document titled "Assignment of Property Damage Claim Only" purports to assign Plaintiff the right to bring claims against Progressive's insureds.   Third Party Assignments, Kochis Decl. Ex. "F".  Despite being signed before repairs are completed on the Third Party Assignors' vehicles, this form contains the amount that Plaintiff alleges Progressive failed to pay to restore the Assignors' vehicles to pre-loss condition. Id.; Nick's Dep. 36:5-20. Kochis Decl. Ex. "A".  This assignment only assigns Plaintiff the right to sue Progressive's insured for property damage relating to the Assignors' motor vehicles.  Third Party Assignments, Kochis Decl. Ex. "G".   The document titled "Authorization for Assignment of Claim and Proceeds" likewise only assigns Plaintiff the right to sue Progressive for property damage*

7

*relating to the Third Party Assignors motor vehicles.  Third Party Authorizations, Kochis Decl.*
*Ex. "F".  The "Authorization for Assignment of Claims and Proceeds is a contractual based*
*assignment relevant only to the First Party Assignors, the Third Party Assignors. Id.*

**RESPONSE:**  Plaintiff responds to the assertions in paragraph 18 as follows:

Subject to the denials in the Response to Paragraph 16, Plaintiff **ADMITS** that the
"Assignment of Property Damage Claim Only" form assigns Nick's certain claims related to the
property damage that the Assignor may have against Progressive's insureds, but **DENIES** that
the form <u>only</u> assigns claims against insureds and not against Progressive, and **DENIES** that the
form <u>only</u> assigns claims for the damage to the vehicle and not the GBL 349 claims here, and
asserts that the interpretation of the Assignment is a question of law and not appropriate for a
statement of facts, but directs the Court to the language on the that also assigns the right to
claims against "any other person or entity arising out of or relating directly or indirectly to
damage done to or suffered by Assignor's motor vehicle on/or about [the date of loss]."  *See* Orso
Decl. Ex. H.

19.     *Once the customers have signed all the forms required by Plaintiff, Plaintiff will*
*inspect the customer's vehicle and, in most circumstances, complete an estimate.  Zaleppa Dep.*
*48:13-19, Koxhis Decl. Ex. "D".  Plaintiff's estimates are solely based on judgment, not actual*
*repair time or paint usage.  Nick's Dep. 125:12-23, 127:27-22, Kochis Decl. Ex. "A".*

**RESPONSE**: Nick's **DENIES** that its estimates are based solely on judgment. In fact,
Nick's generates its estimates using the Mitchell estimating system.   Orso Dep. 37:3-11.
Defendants have flagrantly mischaracterized the testimony they cite, which is that of Mr. Orso at
pages 125 and 127 of his deposition transcript. *See* Statement, ¶19.  Mr. Orso only testified that
the person writing the estimate would use his judgment to estimate how much blending agent

8

was used in painting a particular car (Orso Dep. 125:2-22), and that the person writing the estimate made a judgment as to how many cutoff wheels were used on a particular repair (Orso Dep. 127:9-22). Defendants' apparently hope the Court will not check its citations and therefore will not notice that they have made a staggering and grossly inaccurate generalization from a judgment on two particular items on one particular estimate.

Nick's **ADMITS** that Nick's inspects cars only after required paperwork is completed, but asserts that the only paperwork that Nick's requires before the inspection is the welcome sheet and an authorization to write an estimate. Zal. Dep. 47:14-25, 48:2-19. By placing the statement in Paragraph 19 about "required paperwork" immediately after the discussion of all the assignment forms, Defendants appear to be attempting to suggest that Plaintiff requires the assignment forms, designated representative forms, and so on to be signed before completing an inspection or writing an estimate. To the extent Defendant is making such an assertion, Nick's **DENIES** the same. As stated in response to previous paragraphs of the Statement, Plaintiff does not *require* the assignment form or the designated representative form to be signed by any customer at any time. The only thing *required* to start repairs is the Authorization for Repairs form. All other documents are strictly voluntary. Orso Decl. ¶75.

*20. Progressive also conducts an inspection of the customers' vehicles and drafts its own estimates. Progressive's estimates are drafted by licensed appraisers known as Manager Repair Representatives. ("MRRs"). Stala Dep. 92:6-8; 75:17-20. Kochis Decl. Ex. "R". The MRRs provide Plaintiff with a copy of its estimate of the cost to repair the vehicle to pre-loss condition before Plaintiff begins repairs on the vehicle. Zaleppa Dep. 61-62: 24-5. Kochis Decl. Ex. "D". In addition, before repairs begin on the vehicle, Progressive provides its customers*

*with a copy of its estimate of repair costs.  Stala Dep. 135:8-23, 137:14-20; Koxhis Decl. Ex.*
*"R".*

RESPONSE: Nick's **DENIES** that Progressive's estimates actually do provide the amount necessary to return the vehicles to pre-loss condition, but otherwise **ADMITS** Paragraph 20.

21.  *Alarmingly, Plaintiff often writes a notation in the repair file that Progressive "refused to negotiate".  Zaleppa Dep 172:3-175:11, Koxhis Decl. Ex. "D".  Not surprisingly, Plaintiff's estimator Larry Zaleppa admits that his notation in the Assignors' repair files that Progressive "refused to negotiate" is not always accurate. Id. at 175-176:16.*

RESPONSE:  Nick's **ADMITS** that Nick's often writes a notation in the repair file that Progressive refused to negotiate, but **DENIES** that it is alarming and **DENIES** that the notation is inaccurate.  Once again, Defendants are mischaracterizing deposition testimony. The notation "refused to negotiate" refers to whether or not Progressive negotiated all aspects of the claim, as Mr. Zaleppa correctly understands insurers are obligated to do under New York insurance rules. Zal. Decl. ¶3.  So, for example, when Progressive negotiates on labor times but refuses to negotiate the labor rates, it has not fulfilled its obligations under insurance law and therefore has refused to negotiate with the meaning of Regulation 64.  *Id.*  The notation "failed to negotiate" appears on the collection sheet refers to whether or not Progressive fulfilled its obligation to negotiate *all* aspects of a claim.  Zal. Decl. ¶3.

In the cited portion of Mr. Zaleppa's testimony, counsel merely asked Mr. Zaleppa if Progressive had negotiated with respect to certain line items on one particular repair, the Warner file, and Mr. Zaleppa admitted that *with respect to certain line items*, they had.  Zal. Dep. 176:5-16; Zal. Decl. ¶5.  He did *not* testify that the notation "refused to negotiate" was inaccurate as

applied to the entire file.  *Id.*  In fact, he said that it *was* accurate, because the appraiser had refused to negotiate on some aspects of the claim. (174-175:15-3).  Among other things, Progressive had failed to negotiate on labor rates.  Zal. Decl. ¶6.  Therefore, the notation "failed to negotiate" correctly indicated that Progressive had failed to fulfill its obligation to negotiate all aspects of the claim.  Zal. Decl. ¶¶3-5.  In fact, throughout the time period, Progressive consistently refused to negotiate the labor rate, instead giving shops a "take it or leave it" figure.  Zal. Decl. ¶6.  *See supra*.

This creates a material issue of fact as to the extent to which Progressive negotiated or instead engaged in "take it or leave it" strong arm tactics, in order to force Nick's to accept an unreasonable labor rate.

22.     *Plaintiff eventually compares its estimate to Progressive's estimate.  Zaleppa Dep. 62:4-8, Kochis Decl. Ex. "D".   Plaintiff, however, does not tell at that time Progressive that its estimate differs from Progressive's.  Id. at 62:12-24.  Instead, Plaintiff will take the vehicle apart to determine if there is any additional damage that needs to be repaired.  Id. at 62:12-15.  After Plaintiff has reviewed the vehicle for additional damage, it "might" notify Progressive if there are differences between Progressive's and Plaintiff's estimates.  Id. at 62:12-19.   Not until after repairs are started on the vehicle will Plaintiff notify Progressive that there are differences between Plaintiff's estimate and Progressive's estimate.  Id. at 62: 20-24.*

**RESPONSE:**  Nick's **DENIES** that it "might" notify Progressive if there are differences and asserts that it *does* inform Progressive if there are differences between Progressive and Nick's estimates. Zap. Depo. 62-63:20-14; Orso Decl. ¶77; Zal. Dep. ¶13.  Mr. Zaleppa's use of the word "might" in the cited testimony referred to timing, not whether or not the notification would happen.  Zal Dep. 62:12-19.  Nick's **ADMITS** that typically most notices of deficiency

happens after repairs have begun, because typically the hidden damage requiring a supplement is discovered during the course of repairs.  Zap. Decl. ¶8; Orso Decl. ¶77.

23.     *In charging for paint and materials, Plaintiff does not personally calculate the number of hours it spends to paint a vehicle or the quantity of materials used.  Zaleppa 138:4-141:23, Kochis Decl. Ex. "D".  Progressive allots costs for paint and materials using its estimating software. Lee Dep. 243:4-6, Kochis Decl. Ex. "C".*

**RESPONSE:** Nick's **ADMITS** that Progressive allots costs for paint and materials using its estimating software.  Plaintiff also uses software to calculate the amount of refinishing materials; specifically, software called Paintex.  Zal. Dep. 137-140; Orso Decl. ¶80, Ex. L. Plaintiff calculates the number of refinishing hours on the job using estimating software. Zal. Dep. 142-143:18-11.

Progressive apparently is claiming that its paint and material charges are reasonable because it uses estimating software to generate them.  Plaintiff also uses estimating software to generate its paint and material estimates and points to this as one factor in determining that its charges are reasonable.  Therefore, there is a material question of fact as to whether or not the paint and material charges on Nick's invoices are reasonable.

## The Alleged Deficiencies

24.     *The difference between Progressive's and Plaintiff's estimates are set forth in a document Plaintiff creates called a "Notice of Deficiency".  Zaleppa Dep. 64-65:18-5, Kochis Decl. Ex. "D".  Plaintiff's "Notice of Deficiency" is a request for Progressive to write a "supplement" to its original estimate.  Id. at 62-65:20-5.  Once Progressive becomes aware of a repair cost difference, Progressive will re-inspect the vehicle and usually write a supplement to its original estimate. Id. at 63:15-19; 82:4-14.*

12

**RESPONSE:** Nick's **ADMITS** that the Notice of Deficiency is a request for Progressive to write a supplement to its original estimate. The Notice of Deficiency and the Deficiency Bill together set forth the difference between Progressive's and Nick's estimates.  Zal. Dep. 65:3-15; Orso Decl. Ex. E.

Nick's **DENIES** that Progressive always re-inspects the vehicle after becoming aware of a difference.  Zal. Decl. ¶8.  Defendants once again have mischaracterized the deposition testimony.  Mr. Zaleppa simply testified that with respect to one particular repair, Progressive's estimator David Stala had written a supplement.  Zal. 63:16-19.  In fact, while Plaintiff's requests for supplements are always based on the visual inspection of the vehicle by Nick's employees, Progressive's adjusters frequently respond to the request for a supplement without even reinspecting the car.  Zal. Decl. ¶8.

Accordingly, for the reasons set forth in this response, there is a material issue of fact as to whether or not Progressive's decisions to supplement or not are based on actual visual inspections of the vehicle, which is relevant to the question of whether or not Nick's was charging a reasonable amount for its services.  *See supra.*

25.     *Plaintiff then creates a second and final Notice of Deficiency.  Zaleppa Dep. At 82:15-22., Kochis Decl. Ex. "D".   Plaintiff purports that this Notice of Deficiency represents the line items on the estimate that Progressive did not pay.  Id. at 172: 18-20.*

**RESPONSE:** Nick's **DENIES** that its final Notice of Deficiency is always its second one.   Orso Decl. ¶¶77-78.   Plaintiff sometimes has to send out more than two notice of deficiency and Defendants sometimes write more than one supplement.  Orso Decl. ¶¶77-78. Plaintiff also notes in some instances, Progressive has failed to pay anything for certain line items, but in other instances it has paid something toward the line items on Nick's estimates but

13

has paid less than the full amount required to repair the vehicle to pre-accident condition.  Orso
Decl. ¶31.  For example, this is frequently the case where Progressive allows a labor operation,
but pays only $44/hour for that labor instead of a reasonable labor rates.  Orso Decl. ¶79.  Nick's
**ADMITS** the remaining allegations of Paragraph 25, to the extent they are not inconsistent with
what is set forth herein.

     *26.     Plaintiff does not provide the final Notice of Deficiency to Progressive or to the
customer.  Zaleppa Dep. At 82:20-22; 83-84:22-11; 84:8-13, Koxhis Decl. Ex. "D". Plaintiff may
add new line items to the final Notice of Deficiency, yet never provide the document to
Progressive.  Id. at 175-176:6-16; Notice of Deficiency of Neil Warner, Kochis Decl. Ex. "H". In
addition, Plaintiff acknowledges that some items on its final Notice of Deficiency were or may
have been negotiated and/or paid for by Progressive. Zaleppa Dep. 213:3-15, Koxhis Decl. Ex.
"D".*

     **RESPONSE:** Nick's **DENIES** that it adds new items to the final Notice of Deficiency
without providing Progressive notice of those items.   Although Progressive makes these
statements very generally, its citations show that it is relying on deposition testimony which
addressed only two specific claims:  the Warner claim and the McGee claim.  *See* Statement,
¶26*, citing* Zal. Dep. 176-176, 213.   In fact, however, the record shows that Progressive *did*
receive notice of all of the items composing the deficiencies in the Warner claim and the McGee
claim.  Cannon Decl., ¶4, Ex. A; Zal. Decl. ¶11, Exhs. B&C.

     Nick's **DENIES** that it never provides the final Notice of Deficiency to the customer or to
Progressive.  Progressive yet again has taken Mr. Zaleppa's testimony about one particular file
(in this case, the Birnbaum file) and inaccurately asserted that Mr. Zaleppa testified something
was *always* done that way.  Zal. Dep. 82-83:15-18.  Moreover, with respect to the Birnbaum file,

Mr. Zaleppa testified that the final deficiency bill for the Birnbaum file differed from the one previously provided to Progressive only in that Nick's *removed* the items Progressive paid for, thereby *decreasing* the total deficiency.  Zal Dep. 83:5-13.  Mr. Zaleppa further testified that the reason he did not provide the final deficiency bill on the Birnbaum file to Progressive was because he had already given Progressive notice of all of the items on that bill, and Progressive through its appraiser had indicated it would not pay those items.  Zal Dep. 82-83:20-13.

Nick's **ADMITS** that sometimes it may not provide the Deficiency Audit (which appears to be what Progressive means when it says the final Notice of Deficiency) to Progressive or the Customer, but asserts that as a general rule, Progressive is notified of the items on that Deficiency Audit either through a prior Notice of Deficiency with Deficiency Bill or when Nick's sends Progressive the final invoice.  Zal. Decl. ¶¶13-14.

Nick's **ADMITS** that occasionally, among the thousands of repairs Plaintiff does each year, and the hundreds of thousands of individual line items that have to be compared one by one with insurance estimates, there quite possibly are some items which were mistakenly included among the deficiency calculations, even though Defendants have failed to identify any such actual errors in this case. Zal. Decl. ¶¶14,15; Can. Decl. ¶4.  However, any such errors amount to a *de minimus* amount of the total claims in this case.   Zal Decl. ¶13.

Accordingly, for the reasons set forth in this response, there is an issue of fact as to whether or not Progressive was provided with notice of each of the items which compose the deficiency amounts. *See supra*.

27.    *The Claimed deficiencies fall into one of four categories:  (1) auto body labor rates; (2) parts; (3) overhead expenses; and (4) paint and materials charges.  See e.g. Notice of*

*Deficiency for Neil Warner, Kochis Decl. Ex. "H"; Notice of Deficiency for Michael Angelo,*

*Kochis Decl. Ex. "I"; Notice of Deficiency for Cynthia Pyrtle, Kochis Decl. Ex. "J".*

**RESPONSE:** Nick's **DENIES** the assertions in Paragraph 27.  The Deficiencies fall into five broad categories:  (1) labor rate deficiencies (2) labor hour deficiencies, (3) parts, (4) paint and material allowances, and (5) repair related service charges.  *See, e.g.*  Orso. Decl. ¶80*; see also e.g.* Notice of Deficiency for Neil Warner, Kochis Decl Ex. H; Notice of Deficiency for Michael Angelo, Kochis Decl. Ex. I; Notice of Deficiency for Cynthia Pyrtle, Kochis Decl. Ex. J.

The first category, labor rate is the shortage that arises because Progressive pays an artificially suppressed labor rate which it does not negotiate. Orso Decl. ¶80.

The second category, labor hour deficiencies, arises when Progressive imposes arbitrary caps on the number of hours it will allow for certain common operations, like rustproofing and clear-coating. Orso Decl. ¶80.  For example, Progressive admittedly caps the number of clear coat hours allowed on its estimates at 2.5 hours and programs its software to disallow clear-coat times beyond this, even though the estimate included repair operations for which additional clear coat time would have been allowed by the software absent the cap.  Orso Decl. ¶80.

The third category, parts, arises when Progressive fails to pay the full price for parts which were actually used on the vehicle.  Orso Decl. ¶80.

The fourth category, paints and materials, arises when Progressive fails to pay the full cost of the paint and materials used on the vehicle.  Orso Decl. ¶80.

The fifth category, repair related service charges, are for incidental services that are required for the specific repairs being done on the vehicle.  Orso Decl. ¶80.  The most common charge is a hazardous waste removal charge, which is the service charge for properly disposing of old tires removed from the vehicles, excess paint, oil, and other hazardous waste resulting

16

from the particular vehicle repair in compliance with all applicable state and federal health, safety, and environmental regulations.  Orso Decl. ¶¶25, 80**.**  This is not an "overhead" cost, because it arises as a direct result of the repair costs.  Orso Decl. ¶25.

## Labor Rates

*28.      Progressive monitors its labor rate constantly on an estimate-by-estimate basis. Dep. Tr. Of Louis Deluca taken on Feb. 27, 2014 ("Deluca Dep.") at 95:4-11, Kochis Decl. Ex. "K".  Progressive utilizes its "Labor Rate Reference Guide" to determine the prevailing labor rate in a geographic area.  Dep. Tr. Of Michael Beney taken on June 5, 2014 ("Beney Dep.") at 13:11-17, Koxhis Decl. Ex. "L".   The purpose of the Labor Rate Reference Guide is to provide a consistent approach to determining labor rate.  Deluca Dep. 33:18-21, Kochis Decl. Ex. "L". To create the Labor Rate Reference Guide, Progressive gathered feedback from leaders in the field as to how they were determining labor rate [sic] and then reviewed the feedback to establish a best practice. Id. at 35:12-25.*

**RESPONSE:**  Nick's does not dispute that Mr. DeLuca and Mr. Beney testified that Progressive's policy was to do the things set forth in Paragraph 28, but **DENIES** that Progressive did in fact monitor its labor rate in Onondaga County during the relevant time frame as stated and **DENIES** that Progressive followed the Labor Rate Reference Guide in determining what rate Progressive would pay in Onondaga County during the relevant time frame, and **DENIES** that the rate that Progressive paid was the true prevailing labor rate, as set forth below.

Progressive's first designated representative, Mr. Louis DeLuca, testified that the process by which labor rates in Onondaga County were set for 2008 forward was contained in the labor rate reference guide.  DeLuca Dep. 31-34:12-13, 58:22-25, 80-81:25-121; DeLuca Depo. Ex. 4, Cannon Decl. Exhs. C & D.  The labor rate reference says that Progressive *should* constantly

17

monitor its labor and material rates.   DeLuca Depo Ex. 4, Cannon Decl. Exh. D. It further specifies the method by which that "constant" monitoring is to occur: its representatives should discuss labor rates with the repair shop when there is a difference between Progressive and the shop, on a repair by repair basis.   *Id.*   The labor rate reference guide also says that if there is a difference, Progressive's representative should work to reach an agreed price with the shop. *Id.*

However, Progressive's appraiser Corey Lee testified that the labor rate that was on his first estimate was the labor rate that he pays, and that there was little to no discussion with Nick's regarding that rate.  Lee Depo. 215-216:3- 18.  In fact, Mr. Lee admitted that Nick's had offered to "split the difference" on labor rate with him before, but that he never discussed that offer with them.  Lee Depo. 218:5-10, 219-220:21-20, 285:3-14. In response to the written offer to "split the difference" contained on Nick's supplements, Mr. Lee's practice is to complete his own supplement, containing the same labor rate as what he initially paid.  Lee Depo. 222:2-18. Mr. Lee testified that he simply pays the labor rate that is pre-loaded into his software.  Lee Depo. 107:14-23; 178:12-21; 224:5-7; 284:16-21.

Mr. Lee also testified that it was not uncommon for shops to have a different labor rate on their estimate or supplement from what was on his estimates.  Lee Depo 221:2-5.  He made this statement generally, not simply with reference to Plaintiff.  *Id.*  Yet Mr. Lee testified that it is his practice to authorize payment at the pre-loaded rate in his software profile.  Lee Depo. 140-141:8-12.  Despite acknowledging that shops frequently write their estimates at a rate different from Progressive's, Mr. Lee could recall only one instance when he modified the labor rate, and said that he did so only after consultation with his manager.  Lee Depo. 141-142:13-9; 179-180:24-9.

Mr. Lee thus did *not* follow the procedures in the labor rate reference guide: he did not discuss the difference in rates with the shop on an estimate by estimate basis and he did not attempt to reach an agreed price on rates. *See supra.*

Similarly, Mr. Stala testified that he had no involvement in determining what labor rates were paid. Deposition Testimony of David Stala, taken March 18, 2014 ("Stala Depo.") 97:12-15. He further testified that there was not really any discussion on labor rates. Stala Dep. 226:10-16. Mr. Stala also testified that if he were going to make any changes to the labor rate, he would discuss it with his manager or superviser prior to doing that. Stala Dep. 162:11-18.

Between them, Mr. Stala and Mr. Lee wrote the estimates for 39 of the 40 claims in this case. Can. Decl. ¶12.

This creates an issue of fact as to whether or not Progressive was actually monitoring its labor rates and whether or not Progressive was actually setting its labor rate in compliance with the method set out in the Labor Rate Reference Guide. This fact is material because it goes to the issue of the reasonableness of labor rates, and whether or not Progressive is engaging in a deceptive practice by representing itself as using a fair and impartial method to determine labor rates when it is not.

29.     *Progressive conducts a labor rate review when MRRs are having difficulty reaching agreed prices in a geographic area. Beney Dep. 15:9-14, Kochis Decl., Ex. "L"; Deluca Dep. 82:7-14, Kochis Decl. Ex. "K".*

**RESPONSE:** Nick's **ADMITS** that it is Progressive's stated policy to conduct a labor rate review when MRRs are having difficulty reaching an agreed prices in a geographic area, but **DENIES** that Progressive actually followed that policy for Onondaga County for the time frame

in this case.  Nick's denial is based on the testimony set forth in response to Statement ¶28, which is hereby incorporated herein.

30.     *To conduct the labor rate review, Progressive will obtain proof from shops of the labor rates that shops are accepting within the region.  Beney Dep. 25:11-23, Kochis Decl., Ex. "L".*

**RESPONSE:** Nick's **ADMITS** that Progressive claims its stated policy to conduct a labor rate review when MRRs are having difficulty reaching an agreed prices in a geographic area, but **DENIES** that Progressive actually followed such a policy for Onondaga for the time frame in this case, as Defendants have not put in any admissible evidence showing that did in fact happen.  Can. Decl. ¶19.

31.     *As part of its labor rate review process, Progressive also evaluates subrogation information and industry data.  Deluca Dep. 61-62: 13, Kochis Decl. Ex. "K"; The purpose of reviewing the subrogation data is to determine what the body shop accepted for an hourly labor rate to reach an agreed price to repair a vehicle.  Beney Dep. 27:14-19, Kochis Decl. Ex. "L". Using this labor rate review process, Progressive determined that the amount it generally pays for standard auto body collision body repair work in the Syracuse area is $46 an hour.  Labor Rate Increase Request, Kochis Decl. Ex. "N".*

**RESPONSE:** Nick's **ADMITS** that Progressive claims its stated policy is to review subrogation and industry data as part of its labor rate review process, but **DENIES** that Progressive actually followed such a policy for Onondaga for the time frame in this case, as Defendants have not put in any admissible evidence showing that did in fact happen. Can. Decl. 19.

Furthermore, Nick's **DENIES** that reviewing the insurance estimates in a subrogation file will show what the body shop accepted for an hourly labor rate, since the insurer estimates only show the rate the insurer paid, not what the body shop is willing to accept.  Orso Decl. ¶78.

32.    *For the Assignors' repairs, Plaintiff charged between $68 and $75 per hour for body labor.  Notice of Deficiency for Lee Moulter, Kochis Decl. Ex. "V"; Notice of Deficiency for Christine Reschke, Kochis Decl. Ex. "S".*

**RESPONSE**:  Nick's **ADMITS** the facts in Paragraph 32.

33.    *Plaintiff currently charges between $82 and $125 an hour for auto body labor. Nick's Dep. 31:4-8, Kochis Decl. Ex. "A".*

**RESPONSE**:

Nick's **ADMITS** that its body labor rate and paint labor rate vary between $82 and $125, depending on whether the vehicle being repaired is a custom, exotic, or specialty car, and depending on whether it is a standard repair or whether Nick's is re-repairing another shop's work.  Orso Dep. 31-32:18-10.

34.    *Plaintiff has never conducted a labor rate survey.  Zaleppa Dep. 112-113:22-2, Kochis Decl. Ex. "D".  In addition, Plaintiff does not monitor what other auto body shops in the area charge for body labor.  Id. At 119:17-25.*

**RESPONSE:**  Nick's **ADMITS** the facts in paragraph 34, but states that Plaintiff has reviewed labor rate surveys conducted by others of the auto repair labor rates in Onondaga County.  Orso Decl. ¶8.

35.    *Plaintiff provides "regular" customers with discounts and does not charge them an hourly labor rate.  Zaleppa Dep. 113:13-25, Kochis Decl. Ex. "D".  Instead, Plaintiff charges*

21

"regular" customers a set or flat amount.  Id. At 115-116:25-6; 114-115:22-6; 115-116:17-6.

This flat amount is also sometimes discounted. Id. At 116:4-6.

     **RESPONSE**:  Nick's **DENIES** that as a general rule it provides "regular customers" with discounts and **DENIES** that "regular customers" pay only a flat rate.  Defendants are once again distorting the deposition testimony.

     At the cited portions of the testimony, Mr. Zaleppa was discussing Nick's arrangement with two auto dealerships in the Syracuse area, Alan Byer Volvo and Steve Rotella Sales, for whom Nick's regularly does painting work.  Zap. Decl. ¶16; Zap Dep. 113-115:6-24.   Mr. Zaleppa's testimony was actually *the exact opposite* of what Defendants' represented in the Statement – Mr. Zaleppa testified that Nick's *did* charge Alan Byer Volvo and Steve Rotella the full posted hourly labor rate for that paint labor.  Zal. Dep. 113:6-12, 114:15:24, 115:10-24. Mr. Zaleppa acknowledged that sometimes those dealerships would negotiate for discounts, and that sometimes he would quote them a flat fee.  Zal. Dep. 113:116:6-16.  However, even when Mr. Zaleppa quoted a flat fee, he calculated that fee based on his estimate of the number of hours it would take to do the job times the hourly paint rate.  Zal. Decl. ¶18.

     In other words, Nick's started out charging the full hourly rate for its work, but when asked by these dealerships to negotiate, it did.  This is exactly the same thing that it does for its individual customers paying out of pocket.  Zal. Dep. 109-112:21-21.  Mr. Zaleppa testified that customers who paid out-of-pocket instead of with insurances paid Nick's full posted labor rates, and that Nick's did not offer any discount to those customers, but that occasionally one of those customers would negotiate a lower rate with Nick's.  Zal. Dep. 110-11:20-14.  Importantly, it is also the exact same thing Nick's is asking Progressive to do here – but which Progressive refuses to do.   Orso Decl. ¶7; Zap. Decl. ¶17.  Thus, Nick's takes a consistent approach to all of its

customers, whether they are dealerships, individual customers paying out of pocket, or individual customers paying with insurance. *See supra*. The only difference is that Progressive will not negotiate but simply writes its estimates for a set labor rate, employing a "take it or leave it" approach. Zal. Decl. ¶6.

While Progressive claims it negotiates, Plaintiff has put in significant evidence that it does not, particularly with respect to labor rates. *See supra*, Response to Paragraph 28-29; Zap. Decl. ¶6. This creates a material issue of fact as to whether or not Progressive is willing to negotiate labor rates with Nick's, or whether instead Progressive simply engages in strong-armed "take it or leave it" tactics. This fact is relevant both to the question of the reasonable cost of repairing the vehicles to pre-accident condition and to the question of whether Progressive engaged in deceptive business practices within the meaning of GBL §349.

36.     *On May 7, 2014, Progressive deposed Mark Watts, the owner of Abacus Associates. Deposition of Mark Watts taken on May 7, 2014 ("Watts Dep.") 17:19-20, Kochis Decl. Ex. "O". Plaintiff, through its counsel, retained Abacus to conduct a labor rate survey in Syracuse area for this case. Id. At 30:17:24.*

**RESPONSE**: Nick's **ADMITS** the facts in Paragraph 36.

37.     *During his deposition, Mr. Watts authenticated a document marked "Exhibit 1" to the report he drafted summarizing his findings. Watts Dep. 14:7-24, Kochis Decl. Ex. "O"; Abacus Report, Kochis Decl. Ex. "P".*

**RESPONSE**: Nick's **ADMITS** the facts in Paragraph 36.

38.     *Abacus conducted a survey of 173 repair shops in Onondaga County in September 2013. Abacus Report 1, Kochis Decl. Ex. "P". For shops that perform collision work and had posted labor rates, Abacus noted the "posted" hourly rate for body work is $51.77. Id.*

**RESPONSE**:  Nick's **ADMITS** that Abacus conducted a survey of 173 repair shops in Onondaga County in September 2013.  Nick's **DENIES** that Abacus found that the "posted" rate for body work was $51.77.  Watts Report, p.12, Q&, attached as Exhibit P to the Kochis Decl. Rather, the survey question asked what was the "posted or most typical labor rate."  Watts Report, p.12, Q7.  Unfortunately, the ambiguity in the question does not make clear whether the answer given was for the *posted* rate, or the rate the shop most frequently *receives*.  *Id.*

39.     Thirty-three percent of the body shops surveyed had a "posted" labor rate under $50.  Abacus Report 12, Kochis Decl. Ex. "P".  Only 6% of Collision Shops had a posted labor rate over $70. Id. at 1.

**RESPONSE:**  Plaintiff **DENIES** the allegations in Paragraph 39.  Watts Report, p.10, 12, Q1, Q7.  Defendants are failing to distinguish between different types of labor, as more specifically set forth below.

The Abacus survey found that for mechanical repairs, the average posted rate was $80.14, with a majority of shops (56%) charging $80 / hour or more.  Watts Report, p.10, Q1.  In fact, 26% of shops charged $90 / hour or more for mechanical repairs.  *Id.*  In comparison, Progressive on these claims generally paid $45 / hour for mechanical labor, with a few exceptions where Progressive paid $65 / hour for mechanical labor.  Cannon Decl. ¶13, Ex. J. Nick's is seeking recovery for Progressive's failure to Nick's reasonable mechanical rate charged as part of these claims.  *See, e.g.*, Orso Decl. Ex. E, Deficiency Bill for Burgess, N-PRO000228-229, Line 52; Deficiency Bill for Guntrum N-PRO000736-737, Line 17; Deficiency Bill for McFarland, N-PRO001188-1189, Line 38; Deficiency Bill for McGee, N-PRO001255-1256, Line 15; Deficiency Bill for Moulter, N-PRO001378-1379, Line 9; Deficiency Bill for Reschke, N-PRO001531-1532 Line 40; Deficiency Bill for Rivera, N-PRO001619-1620, Line 43;

Deficiency Bill for Wolfe, N-PRO001949-1950, Line 14.  Thus, there is an issue of material fact as to whether or not the labor rate Progressive paid for mechanical repairs on the Assignors' vehicles was unreasonable, and whether Nick's rate was reasonable.

The Abacus survey also found that the average rate for frame labor was $62.47, with 45% of body shops charging over $60 / hour for frame labor, and in fact, 28% of shops charging $70.00 or greater per hour.  Watts Report, p.12, Q7.  In comparison, Progressive on these claims generally paid $48/hour for frame.  *See, e.g.* Burgess Estimate, PROG1724-1729, Cannon Decl. Ex. J.  Nick's is seeking recovery for Progressive's failure to pay the market rate on frame repairs as part of these claims.  *See, e.g.*, Orso Decl. Ex. E.  Deficiency Bill for Burgess, N-PRO000221-222 (summary section); Deficiency Bill for Reschke, Christine N-PRO001531-1532 (summary section).  Thus, there is a material issue of fact as to whether or not the labor rate Progressive paid for frame repairs on the Assignors' vehicles was unreasonable, and whether Nick's rate was reasonable.

The Abacus survey found that the posted or most typical average labor rate for paint was $52.30, with 55% of shops reporting rates of $50/ hour or more.  Watts Report, p.12, Q7.  The Abacus survey found that the posted or most typical average labor rate for body repairs was $51.77, with 54% of shops reporting rates of $50/hour or more.  *Id.*   In comparison, Progressive generally paid $44-$46 / hour for paint and body work during this time period.  Cannon Decl. Ex. J.  Nick's is seeking recovery for Progressive's failure to pay the market rate on paint and body repairs as part of these claims.  *See, e.g.*, Orso Decl. Ex. E..  Thus, there is a material issue of fact as to whether or not the labor rate Progressive paid for paint and body repairs on the Assignors' vehicles was unreasonable, and whether Nick's rate was reasonable.

40.     In its report, Abacus acknowledges that shops do not always collect their "posted" labor rates.  Abacus Report 1, Kochis Decl. Ex. "P".  For example, with respect to mechanical shops, 5% of the shops surveyed by Abacus stated that they did not receive their "posted" labor rate for mechanical rates, but on average, were paid $12.77 less than their "posted" labor rate. Id.

**RESPONSE:** Nick's **DENIES** the assertions in Paragraph 40, as the survey question actually asked what shops *charged*, not what the "collected" or "received".  Watts Report, pp.10-11, Q2, Q3.  In addition, Nick's observes that 94% of shops said they *do* receive their posted rate for mechanical repairs according to the survey.  Watts Report, p.10, Q2., Kochis Decl. P.

41.     Plaintiff admits that labor rates other body shops are paying should be considered when insurance companies are calculating their rates.  Nick's Dep. 140:9-17. Kochis Decl. Ex. "A".  Furthermore, Plaintiff agrees that what other body shops are charging should have an impact on what insurance companies are obligated to pay.  Id. at 140:13-22.

**RESPONSE:** Nick's **DENIES** the first sentence in Paragraph 41.  In fact, what Mr. Orso testified to was that the rates *charged* (not paid) by its competitors should be considered in calculating the "competitive rate".  Orso Dep. 140:9-22.  Nick's **ADMITS** the second sentence in Paragraph 41.

### Parts

42.     Plaintiff prefers to repair vehicles with original manufacturer parts rather than non-original parts.  Although Progressive will write an estimate specifying the use of non-original manufacturer parts, Plaintiff will disregard Progressive's estimate and repair the vehicle with original manufacturer parts.  See Progressive Estimate for Michael Angelo and Notice of Deficiency for Michael Angelo, Kochis Decl. Ex. "I".

26

**RESPONSE:**  Nick's **ADMITS** the first sentence of Paragraph 42 of the Statement. Nick's wrote estimates and repaired the Assignors' vehicles for the parts that, in the assessment of Nick's, were the ones necessary to return the Vehicles to their pre-accident condition, whether or not Progressive agreed with that assessment.  Orso Decl. ¶76.  Nick's therefore **ADMITS** the facts contained in Paragraph 42 but **DENIES** that Nick's had any obligation to follow Progressive's estimate, which Progressive seems to be implying.  *Id.*

43.    *Plaintiff's claimed damages include part price differences between original manufacturer parts and non-original parts that Progressive paid for pursuant to its estimates. See e.g. Notice of Deficiency for Michael Angelo, Kochis Decl. Ex. "I"; Notice of Deficiency for James Burgess, Kochis Decl. Ex. "Q".*

**RESPONSE:**  Nick's **ADMITS** the facts in Paragraph 43 of the Statement.

44.    *Plaintiff's claimed damages include hundreds of dollars for more expensive original manufactured parts.  See e.g. Notice of Deficiency for Michael Angelo, Kochis Decl. Ex. "I"; Notice of Deficiency for James Burgess, Kochis Decl. Ex. "Q".  Plaintiff has not produced any evidence in this litigation as to why the more expensive original manufactured parts were necessary to restore the Assignors' vehicles to pre-loss condition.*

**RESPONSE:**  Nick's **ADMITS** the first sentence of Paragraph 44 of the Statement and **DENIES** the second sentence of Paragraph 44 of the Statement.  Orso Decl. ¶¶30, 32; Declaration of Rocco Avellini, dated October 10, 2014 ("Av. Decl."), ¶¶12-14.

45.    *Importantly, when selecting the part price to restore a vehicle back to its pre-loss condition, Progressive MRRs do not always choose the part with the lowest price.  For example, a MRR may choose a part that is more expensive if it is out of stock elsewhere because the more*

27

*expensive part will improve cycle time, or the amount of time it takes to repair the vehicle. Lee Dep. 233:10-24, Kochis Decl. Ex. "V".*

**RESPONSE:** Nick's **ADMITS** that this is true today, but **DENIES** that this was the case during the full 2007-2012 time frame of these claims.  Orso Decl. ¶39.

### Negotiations

*46.   Progressive reaches agreed prices with body shops to restore vehicles back to pre-loss condition a majority of the time.  Deluca Dep. 101:21-25; 105-106:18-6; 108:4-22, 109-110:20-18, Kochis Decl. Ex. "K".*

**RESPONSE:** Nick's **ADMITS** Mr. DeLuca testified as stated, but notes that according to Mr. Corey Lee, the definition of an agreed price apparently does not include agreements on labor rates.  *See supra*, Response to Statement ¶29

*47.   Corey Lee, a Progressive MRR who has written estimates in the Syracuse area for nearly ten years, testified that it is rare that he does not obtain an agreed price with a shop.  Lee Dep. 154:7-18, Kochis Decl. Ex. "C".*

**RESPONSE**: Nick's **ADMITS** that Corey Lee testified as stated but observes that Mr. Lee apparently did not consider agreement on labor rates to be necessary for him to reach an "agreed price."  *See supra*, Response to Statement ¶29.  Therefore Mr. Lee's testimony actually shows that Progressive *fails* to meet its good faith negotiation obligations, since it does not negotiate on all aspects of the claim.

As a result, there is a material issue of fact as to whether Progressive as a regular practice and policy negotiates on *all* aspects of the claim, or whether Progressive's regular practice and policy is to offer "take it or leave it" labor rate.

48. *As part of the negotiation process, Progressive makes concessions in order to reach an agreed price. Id. at 263:21. Plaintiff admits that Progressive negotiates labor time and amounts, such as repair allowances. Nick's Dep. 216:18-25, Kochis Decl. Ex. "A".*

**RESPONSE**: Nick's **ADMITS** the Progressive makes concessions on some aspects of the repairs, including at times on labor hour allowances, but **DENIES** that Progressive makes concessions on labor rates. *See supra*, Response to Statement ¶28.

49. *During the time period at issue, there have been Progressive customers' vehicles that were repaired by Plaintiff where Progressive and Plaintiff were able to reach an agreed price to repair the vehicle back to pre-loss condition. Nick's Dep. 19-20:18-6, Kochis Decl. Ex. "A" ("[Nick's] feel[s] we were able to repair the car for the allowance that Progressive made.").*

**RESPONSE**: Nick's **DENIES** that Mr. Orso ever made the statement in quotes in Paragraph 48, as it does not appear at the cited portion of the transcript or in the exhibit to the Kochis declaration, and as Plaintiff has not been able to find it at any other point in the deposition transcripts of either Mr. Orso or Mr. Zaleppa. Can. Decl.¶3.

Nevertheless, Nick's **ADMITS** that there were times during the time period at issue when Plaintiff was able to reach an agreed price with Progressive on repairs – because there were times when Progressive paid substantially more on its labor rate. Orso Decl. ¶¶46,47,82. In particular, when Progressive asks Plaintiff to re-repair vehicles where the vehicles were improperly repaired at other facilities. Orso Decl. ¶¶46-47.

50. *In addition, Progressive regularly returns to Plaintiff's shop to write supplements for additional repair charges Plaintiff requests. See e.g. Lee Dep. 224:13:225:4, Kochis Decl. Ex. "C".*

**RESPONSE**:   Nick's **ADMITS** the allegations of Paragraph 50, except that Nick's **DENIES** that Progressive regularly allows additional amounts for labor rates, **DENIES** that Progressive allows amounts over 2.5 for clear coat, and **DENIES** that Progressive allows any additional above the pre-determined amounts for operations contained in the profiles.  *See supra*, Responses to Statement ¶¶28-29;

51.   *Plaintiff's estimator admits the Progressive has never conducted itself in way that was unethical or inappropriate.  Zaleppa Dep. 136:15-21, Kochis Decl. Ex. "D".*

**RESPONSE**:   Nick's **ADMITS** that Mr. Zaleppa testified that he didn't remember any specific instances of unethical behavior of Progressive employees.   Zaleppa Dep. 136:15-21. Nick's **DENIES** that this is a material fact, in light of the nature of the deceptive conduct Nick's has uncovered in discovery.  *See infra*, ¶¶76-80.

52.   *In contrast, at times, Plaintiff has refused to negotiate with Progressive.   For example, with respect to Assignor Michael McGee, a Progressive MRR testified: "I attempted to negotiate with the labor rate, but he told me to write what I am going to write because he was going to lunch and leave it on his desk." Stala Dep. 268:18-269:9, Kochis Decl. Ex. "R".*

**RESPONSE:**  Nick's **DENIES** that Nick's has ever refused to negotiate with Progressive. Orso Decl. ¶¶7,82.   In fact, the evidence in the record shows that Nick's has offered to accept a compromise labor rate but that Progressive's estimator simply wrote the estimate for the exact same amount as the initial estimate.  *See supra*, Response to Statement ¶28.

53.   *At times, Plaintiff charges insured customers more than non-insured customers. For example, if a customer is paying a tow bill, Plaintiff only charges the customer the cost of the tow to Plaintiff.  Nick's Dep. 34:17-19, Kochis Decl. Ex. "A".  If, however, an insurance company is paying the bill, Plaintiff marks the tow bill up 33% over its cost.  Id. at 34-35:20:6.*

30

**RESPONSE**: Nick's **DENIES** the assertions in Paragraph 53.  Orso Decl. ¶¶8,9.

## Expenses Progressive Alleges are Overhead

*54.    Plaintiff consistently attempts to pass through its overhead expenses to Progressive.  For example, Plaintiff's suppliers are charging it for delivery costs, which Plaintiff profits from by adding an energy surcharge on its estimates.  Nick's Dep. 138:13-21, Kochis Decl. Ex. "A"; Notice of Deficiency for Lee Moulter, Kochis Decl. Ex. "V"; Notice of Deficiency: for Sara Gruntrum, Kochis Decl. Ex. "T"; Notice of Deficiency for Diane Delpha, Kochis Decl. Ex. "U": Notice of Deficiency for Emily Rivera, Kochis Decl. Ex. "W".*

**RESPONSE:** Nick's **DENIES** that the expenses referred to by Progressive are "overhead" charges, because they are incurred as a direct result of the repair against which they are charged, and therefore **DENIES** the first sentence of Paragraph 54.  Orso Decl. ¶29.

Nick's **ADMITS** that Plaintiff's suppliers charge it for delivery charges, and further specifies that some of Nick's suppliers during the 2007-2012 time frame at issue in this case began adding an line item to those suppliers' invoices to Nick's for an energy surcharge.  Orso Dep. 138-139:13-22.

*55.    Plaintiff estimator does not know what the "energy surcharge" is that he charges Progressive for.  Zaleppa Dep. 125:2-9, Kochis Decl. Ex. "D".  Plaintiff's estimator charges Progressive for "energy surcharges" on every estimate because Plaintiff's owner Michael Orso tell him to.  Id. at 125:10-25.*

**RESPONSE:**  Plaintiff **ADMITS** the facts in Paragraph 55.

*56.    In addition to energy surcharges, Plaintiff charges Progressive for fees associated with processing lienholder's checks.  Plaintiff justified charging Progressive the fees associated with processing the lienholder's check in at least one instance because, "[i]f the*

31

*appraiser wasn't such a jerk he would have written the check out to us and avoided the situation." Nick's Dep. 156:3-6, Kochis Decl. Ex. "A".*

     **RESPONSE:** Nick's **ADMITS** the facts in Paragraph 56, and reiterates Nick's position that such fees are a repair specific and therefore are a direct cost of the repair process for particular vehicles. *See Orso Decl.* ¶25. The fees are not charged in every repair. *Id.*

     57.     *Plaintiff did not receive authorization from its customers to charge for fees, such as processing a lienholder's check. Nick's Dep. At 157:9-11, Kochis Decl. Ex. "A". Instead, Plaintiff relies on its Designated Representative Authorization for to charge customers and Progressive any amounts it deems appropriate, without telling the customer. Id. at 157:4-15, 157:11-21.*

     **RESPONSE:** Nick's **DENIES** the assertions in Paragraph 57. Yet again, Progressive has blatantly misrepresented the testimony as being *the exact opposite* of what it actually was. Mr. Orso said that Nick's *did* receive authorization from its customers for the fees, and that the authority to charge customers for processing lienholder checks was contained on the Authorization to Repair form. Orso Dep. 157-158:12-7. Mr. Orso went on to read into the record the provision on the form which *explicitly stated* that all checks with lienholder endorsements had to be released by the lienholder and that doing so would be at the expense of the customer. *Id.*

     The Authorization to Repair form discloses the terms and conditions on which Nick's is offering to do the repair, and by signing it, the customer is agreeing to those terms and conditions, including the lienholder processing fees. Orso Decl. ¶10, Ex. D. Progressive's reference in Paragraph 57 to the Designated Representative form is bewildering, since Mr. Orso said nothing at all about the Designated Representative form in the cited portion of his testimony.

Orso Dep. 157:4-15.    The Authorization to Repair form is not the Designated Representative Form (nor, incidentally, is it the assignment form).  Orso Decl. ¶10, Ex. D.

58.    *While Plaintiff does not charge non-insurance pay customers for photocopies or faxes, part of Plaintiff's alleged damages in this case are for photocopy and fax expenses. Zaleppa Dep. 149-150:24-11, Kochis Decl. Ex. "D"; Nick's Dep. 156-157:25-, Kochis Decl. Ex. "A"; Notice of Deficiency for Michael Angelo, Kochis Decl. Ex. "I", Notice of Deficiency for Christine Reschke, Kochis Decl. Ex. "S"; and Notice of Deficiency for Neil Warner, Kochis Decl. Ex. "H".*

**RESPONSE:**  Nick's **ADMITS** the facts in Paragraph 58 but asserts that the reason is because customers paying out-of-pocket do not generate the same amount of paperwork insurance companies do and therefore Nick's does not incur the expenses for those customers. Orso Decl. ¶26.

59.    *Furthermore, Plaintiff's appraiser cannot remember why he charges Progressive for photocopy and fax expenses.  Zaleppa Dep. 169:14-22, Kochis Decl. Ex. "D".  Plaintiff's appraiser admits that photocopy fees would not be necessary to repair a vehicle back to pre-loss condition.  Id. at 179:3-13.*

**RESPONSE:** Nick's **ADMITS** that Mr. Zaleppa stated that the copying was not part of the physical repair process, but points out that Mr. Zaleppa stated that copying was part of the overall process of dealing with the insurance claim. Zap Dep.179:3-13

Nick's **DENIES** the first sentence in Paragraph 59.  Mr. Zaleppa testified that he could not remember why photo copies and faxes were part of the charges *in the particular case* about which counsel asked him.  Zap Dep. 169-170:14-13.  Furthermore, Defendants' reference to Mr.

Zaleppa as "Plaintiff's appraiser" is erroneous because Mr. Zaleppa is one of two people who write estimates at Nick's, with Mike Orso being the second.  Zap. Dep. 48:20-25.

60.    In addition, Plaintiff's charges Progressive for ALLDATA, an electronic database that contains repair information.  Zaleppa Dep. 75:4-23; 76:24-2; Notice of Deficiency for Sara Gutntrum, Kochis Decl. Ex. "T"; Notice of Deficiency for Michael Angelo, Kochis Decl. Ex. "I"; Notice of Deficiency for Diane Delpha, Kochis Decl. Ex. "U"; Notice of Deficiency for Lee Moulter, Kochis Decl. Ex. "V"; and Notice of Deficiency for Emily Rivera, Kochis Decl. Ex. "W".

RESPONSE: Nick's **ADMITS** the facts in Paragraph 60.

61.    Plaintiff not only charges Progressive to pull information from ALLDATA, but for the time it takes Plaintiff to print the information.  Zaleppa Dep. 76:3-13, Kochis Decl. Ex. "D". For example, Plaintiff's Notice of Deficiency shos a charge of $77.40 to access and print ALLDATA information on Irwin Birnbaum's claim. Id. at 75-76:24-23; Notice of Deficiency for Irwin Birnbaum's, Kochis Decl. Ex. "X".  Plaintiff charges Progressive for ALLDATA despite the fact that it can be, and is re-used by Plaintiff.  Zaleppa Dep. 76:14-23, Kochis Decl. Ex. "D".

RESPONSE: ALLDATA is "Westlaw for repair shops". Orso Decl. ¶¶11,22. It is a searchable online database with information on every standard make, model, and year of vehicle. *Id.*  It contains extensive information on repair specifications, schematics, and other critical information which allows Nick's to perform repairs more efficiently and effectively. *Id.*  To use it, the technician or manager enters in various search parameters, which are particular to the specific Vehicle being repaired – for example, "side air bag sensor repair on a 2012 Honda CRV LX".  *Id.*  The search generates information that Nick's employees then review and use in connection with performing the particular component of the repair, such as in this example,

information about the wiring schematics for the air bag sensors and the codes to clear the warning lights that appear on the dashboard saying there is something wrong with the sensor. *Id.*

Nick's charges Progressive for the time involved in using ALLDATA, including the time for the technician to review the information obtained from ALLDATA and diagnose a repair remedy using that information, as well as the time to perform the search, and, incidentally, the time to print the relevant information.  Zap. Depo. 27:7-13; Orso Decl. ¶22.

On the basis of the forgoing, Nick's **ADMITS** the first sentence of Paragraph 61, although Defendant's statement is far from a complete picture of the deposition testimony regarding the issue.  Zap. Depo. 27:7-13; Orso Decl. ¶22.    Nick's **ADMITS** that there are charges totaling $77.40 on the Birnbaum deficiency bill for ALLDATA time but **DENIES** that the charge was for accessing and printing the data only, since it also includes the time to review and apply the information as set forth above and includes the search charge for accessing the database, as ALLDATA is a subscription service Nick's uses.  *Id.*  Nick's **ADMITS** that the ALLDATA database is used on a recurring basis the way lawyers use Westlaw, but **DENIES** that Nick's re-uses information obtained for a particular claim.  *Id.*  Nick's further **DENIES** that re-using the information obtained with respect to a particular vehicle and repair scenario would be feasible or efficient, since each ALLDATA search is crafted for a particular make, year, model, and sub-line of vehicle and for the particular repair scenario presented on that particular vehicle that is in the shop at that particular moment.  *Id.*

62.    *While Plaintiff charges these overhead expenses to Progressive, it provides concessions to non-insurance paying customers.  Id. at 111:15-25.*

**RESPONSE**: Nick's **DENIES** that the expenses referred to by Progressive are "overhead" charges, because they are incurred as a direct result of the repair against which they are charged.  Orso Decl. ¶25,29.

Moreover, Progressive is attempting draw a false picture of Nick's practices by metaphorically mixing apples and oranges.  Progressive's juxtaposition of the reference to "overhead" charges with the reference to concessions by Nick's invites the inference that Nick's is treating insurers less favorably than private-pay customers with respect to so-called "overhead" charges.  In fact, the deposition testimony Progressive cites has nothing to do with the Alldata, fax, photocopy, energy, or processing fees mentioned in previous paragraphs of the Statement which Progressive presumably meant to include under the misnomer "these overhead expenses".

Contrary to Defendants' assertions, Nick's *does* charge customers paying out of pocket for the same fees charged to customers paying with insurance, when those fees are incurred.  Orso Decl. ¶¶8,10, 26.  Nicks offers the same terms to customers paying out of pocket and customers paying with insurance, and both types of customers sign the same Authorization to Repair form containing those terms before Nick's begins work.  Orso Decl. ¶10.

At the cited portion of the testimony, Mr. Zaleppa simply said that he occasionally provides loaner cars at no charge to customers paying out of pocket. Zal. Dep. 111-112:15-11.  Nick's will do the same thing for customers with insurance who don't have or don't want to use their rental coverage.  Nick's has six loaner vehicles available as courtesies to its customers.  If a customer is willing to pay out of pocket for a rental or use their insurance coverage to get a rental, they can have one of the remaining 34 cars in the fleet.  The terms are the same for both types of customers.  Zap Decl. ¶20.

36

Moreover, Plaintiff continues to dispute the characterization of its charges as "overhead". *See supra*, Response to Paragraph ¶27.

Finally, Nick's notes that it does not charge Progressive anything – Nick's charges customers, some of whom happen to be paying using Progressive insurance.  Orso Decl. ¶¶70,71.

63.     *Progressive is not obligated under its Policy with the First Party Assignors to pay Plaintiff's overhead expenses.  Policy at PROG008414-15, Kochis Decl. Ex. "B".*

**RESPONSE**:  Nick's **ADMITS** that Progressive is not obligated to pay true "overhead", but **DENIES** that the items on its bills constitute overhead.

## Assignor's Lack of Knowledge

64.     *Following the commencement of this litigation, Progressive learned that several of the Assignors had no knowledge of this litigation.  Affidavit of Neil Warner, ¶¶5-7 (Feb. 27, 2014). Affidavit of James Cornell, ¶¶ 4, 6-8 (Feb. 22, 2014), Affidavit of Mary Spagnola, ¶¶ 4, 6-8 (Feb. 22, 2014); Affidavit of Susan Heffernan, ¶¶ 4, 6-8 (Feb. 22, 2014); Affidavit of Michael McGee, ¶¶ 4, 6-8 (Feb. 27, 2014): Affidavit of Alex Granozio, ¶¶ 4, 6-8 (Feb. 27, 2014); and the Affidavit of Celestine McLeod, ¶¶ 4, 6-8 (May 6, 2014), Kochis Decl. Ex. "Y".  These Assignors were satisfied with how Progressive handled these claims, and stated that Progressive did not deceive them. Id.*

**RESPONSE**:  Nick's **ADMITS** the facts in paragraph 64, but **DENIES** that they are material, and further directs the Court's attention to the customer declarations submitted by Nick's on this motion.  Can. Dec. Exs. M to V.

## Progressive's Business Records

37

65.     Progressive submits the Affidavits of Louis Deluca, Michael Beney, and Debra Henry authenticating business records annexed to the Declaration of Kymberly Kochis as Exhibits "B", "H", "I", "J", "M", "N", "Q", "S", "T", "U", "V", "W", and "X".

**RESPONSE**: Nick's ADMITS that the referenced Assignors had no knowledge of the litigation but **DENIES** that it is a material fact.

## SUMMARY OF ADDITIONAL MATERIAL FACTS IN DISPUTE

66.     Plaintiff hereby incorporates the Material Facts in Dispute identified throughout the Responses above as part of its Statement of Additional Material Facts in Dispute.

67.     The assignments signed by the Assignors assigned the claim to Nick's Garage, Inc. using the registered assumed name of the entity, Nick Orso's Body Shop and Service Center. Orso Decl. ¶¶2, 70, 72, Exs. A, B, G, H. The Authorization for Assignment of Claim and Proceeds form also contained the name "Nick's Garage Incorporated" in the heading.  Orso Decl. Ex. G.

68.     Progressive's policies allowed it to choose between paying for the loss in money, or repairing or replacing the damaged property.  PROG8415, *attached as* Ex. B to the Kochis Decl. ¶6 ("We may, at our option: 1) pay for the loss in money; or repair or replace the damaged or stolen property.")  Here, Progressive elected to pay for loss in money.  SOF¶13.

69.     Regardless, Progressive was required to pay the amount necessary to repair the damaged vehicles to their pre-loss condition, reduced by any applicable deductible. SOF¶11.

70.     There is a material issue of fact as to whether Progressive has failed to pay the amount reasonably necessary to return the vehicle to pre-accident condition by failing to pay for hazardous waste disposal, even though Regulation 64 specifically identifies hazardous waste

disposal as one of the costs necessary to repair the vehicle to pre-accident condition for which the insurer should pay. Orso Decl. ¶27.

71.     There is a material issue of fact as to whether Progressive has failed to pay the amount reasonably necessary to return the vehicle to pre-accident condition by failing to pay for necessary repair operations and by failing to pay for the full time required for necessary repair operations.  Orso Decl. ¶86.

72.     There is an issue of material fact as to whether Progressive failed to include on its estimate labor operations, or fully pay for labor operations, which were necessary to repair the vehicle to its pre-accident condition.  Nick's has asserted that all of its amounts were reasonable.  Orso Decl. 76.  Progressive's adjuster, Mr. Lee, characterized the items on Nick's deficiency as judgment items for which he disagreed with Nick's assessment.  Lee 260-261:25-10.  Nick's estimates were written by individuals with extensive experience in professional collision repair.  Orso Decl. ¶¶2, 3; Zal. Dep. 16:6-9.  In contrast, Progressive's adjusters Corey Lee and David Stala, who collectively wrote the estimates for 39 of the 40 claims, have *no* experience working for a professional car repair facility.  Stala Depo. 6-8:9-19; Lee Depo. 95:5-23.

73.     There is a material issue of fact as to the amount of paint and materials that were reasonable in each of the 40 claims, since both Progressive and Nick's point to use of estimating software for calculation of those materials. *See supra*, Response to Statement Paragraph ¶23.

74.     There is a material issue of fact as to whether the parts that Progressive says should have been used were actually suitable for the vehicle and would have repaired it to pre-accident condition in a reasonable amount of time.  Orso Decl. ¶31; Av. Decl. ¶13.

75.     There is a material issue of fact as to whether or not a number of the service charges on Nick's invoices were charges directly attributable to the repair process or were overhead. Orso Decl. ¶¶ 25,29.

76.     There is a material issue of fact as to whether Progressive has failed to pay the amount reasonably necessary to return the vehicle to pre-accident condition by failing to pay Nick's reasonable labor rate.  Orso Decl. ¶¶8, 44, Ex. C; Declaration of Frederic Jennings, dated October 9, 2014 ("Jen. Decl."), Ex. B&C.

77.     There is a material issue of fact as to whether Progressive engages in a deceptive practice by presenting itself as writing its estimates to return the vehicle to pre-accident condition, when in fact Progressive is actually writing its estimates to the standard of mere drivability and superficial appearance.

78.     There is a material issue of fact as to whether Progressive misleads the assignors into believing that Progressive would pay the full cost of repairs at the shop of the customer's choice, when in fact Progressive was only willing to pay the amount for which it believed it could have the vehicles repaired at another shop, such as a network shop, and would make the customer responsible for the rest.  Customer Declarations, *attached to* as Exs. M to V to Can. Decl.; Stala Dep. 217-218:23-7.

79.     There is a material issue of fact as to whether Progressive adjusters sometimes indicate in Progressive's electronic claim system that they have reached an agreed price when they have not, and whether that is in fact the result of a programming code in Progressive's system which prevents the adjuster from submitting his claim note if the answer is anything other than "yes, an agreed price was reached."  Stala Depo. 270:18-25.

80.     There is a material issue of fact as to whether Progressive engages in a deceptive practice in setting its labor rates, by stating in its standard form policy that it will pay the "prevailing competitive labor rates charged" in the area, when in fact Progressive is not actually taking steps to determine the labor rate charged in Onondaga County, as more specifically supported by the following facts:

a.   Progressive asserts that it constantly monitors its estimates and purports to base its rates on agreed prices reached in estimates by estimate negotiations, when in fact Progressive's appraisers do not negotiate the labor rates with shops but just pay the pre-loaded price, employing a "take it or leave it" approach.  Zap. Decl. ¶6. *see supra* Resp. to Paragraphs 21 and 28.

b.   Progressive's appraisers do not negotiate, even though many shops estimates charge a different rate than what is set by Progressive.  Lee Depo. 141-142:13-9

c.   In practice, Progressive's appraisers do not change the labor rate without consulting with their supervisor, and they do that extremely rarely if ever.  Lee Depo. 179-180:24-9; Stala Dep. 162:15-18.

d.   Progressive's stated policy is to rely on insurer estimates that are part of the subrogation claim in order to determine what body shops supposedly accept, even though such estimates only indicate what the insurer wants to pay and not whether or not the body shop accepts that rate.  RSOF¶31; Orso Decl. ¶78.

*81.*     There is a material issue of fact as to whether or not Progressive's practice of artificially suppressing the amounts paid for repairs has a negative impact on consumer safety by reducing the quality of repairs in the industry as a whole.  Orso Decl. ¶86. Av. Decl. ¶9.

41

Dated: October 10, 2014                  BOUSQUET HOLSTEIN PLLC

                                         _/s/ Cecelia R. S. Cannon_
                                         Cecelia R.S. Cannon, Esq.
                                         Bar Roll No.: 515626
                                         Attorneys for Plaintiff
                                         110 West Fayette Street, Suite 900
                                         Syracuse, New York
                                         Telephone: (315) 422-1391

2354593_2.docx

42