UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

NICK'S GARAGE, INC.,

                Plaintiff,

     v.

PROGRESSIVE CASUALTY INSURANCE COMPANY;
NATIONAL CONTINENTAL INSURANCE COMPANY;
PROGRESSIVE ADVANCED INSURANCE COMPANY;
PROGRESSIVE DIRECT INSURANCE COMPANY;
PROGRESSIVE MAX INSURANCE COMPANY;
PROGRESSIVE NORTHERN INSURANCE COMPANY;
PROGRESSIVE PREFERRED INSURANCE COMPANY;
and PROGRESSIVE SPECIALTY INSURANCE COMPANY

                Defendants.

Civil Action No: 5:12-cv-777
(MAD/DEP)

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Submitted By: Bousquet Holstein PLLC
Cecelia R.S. Cannon, Esq.
Bar Roll #515626
110 W. Fayette Street, Suite 900
Syracuse, NY 13202
(315) 422-1391

# TABLE OF CONTENTS

ARGUMENT ...................................................................................................................1

POINT I - THERE IS AN ISSUE OF MATERIAL FACT WITH RESPECT TO
       WHETHER PROGRESSIVE FULFILLED ITS CONTRACTUAL
       OBLIGATION...............................................................................................2

     A.    Contractual Provisions Related to Progressive's Payment Obligations.........................3

     B.    There is an Issue of Material Fact with Respect for Labor Rates...................................4

     C.    There is a Material Issue of Fact  On The Other Elements of the Repairs....................5

     D.    There is Credible Evidence of Injury Precluding Summary Judgment .........................7

POINT II - PLAINTIFF'S LABOR RATE IS REASONABLE............................................8

POINT III - DEFENDANT HAS ENGAGED IN DECEPTIVE PRACTICES .................12

     A.    Defendants Fail to Negotiate Labor Rates...................................................................17

POINT IV - INJURY.........................................................................................................17

POINT V - THERE IS CONSUMER IMPACT...................................................................19

POINT VI - NICK'S HAS STANDING..............................................................................20

POINT VII - PROGRESSIVE'S DOUBLE HEARSAY SHOULD NOT BE ADMITTED .............22

CONCLUSION...................................................................................................................24

TABLE OF AUTHORITIES

## Cases

*A. Cappione, Inc. v. Cappione*, 119 A.D.3d 1121 990 N.Y.S.2d 297

(3d Dep't 2014) (N.J. Super. June 9, 2010) ............................................21

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986)...........................................1,2

*Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*,

57 F.3d 146 (2d Cir. 1995) ...............................................................21,22

*Beller v. William Penn Life Ins. Co. of N.Y.*, 8 A.D.3d 310 (2d Dep't 2004) ...............18

*Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.2d 501 (2d Cir. 2002)........................2

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)...........................................1,2

*Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005)...........................................1,2

*Joannou v. Blue Ridge Ins. Co.*, 289 A.D.2d 531 (2d Dep't 2001)................................18

*Louis Capital Mkts., L.P. v. REFCO Grp. Ltd., LLC*, 9 Misc.3d 283

*Makuch*, 12 A.D.3d 1110 (4th Dep't 2004) ............................................20

*Miller v. Wells Fargo Bank Int'l Corp.*, 540 F.2d 548 (2d Cir. 1976).............................22

*Nick's Garage v. Liberty Mutual Fire Insurance Company*, No. 13-01497,

2014 WL 3882669 (4th Dep't Aug. 8, 2014) ............................................20

*O'Brien v. Argo Partners, Inc.*, 736 F. Supp. 2d 528 (E.D.N.Y. Aug. 23, 2010).........................22

*Pro Bono Inv., Inc. v. Gerry*, No. 03 Civ. 4347, 2008 WL 4755760

(S.D.N.Y. Oct. 29, 2008)............................................................22

*Rizzo v. Merchants and Businessmen's Mut. Ins. Co.*, 188 Misc.2d 180

(Sup. Ct., App. Term 2001) ............................................................12

*Robert J. McRell Assocs., Inc. v. Ins. Co. of N. Am.*, 677 F. Supp. 721

(S.D.N.Y. 1987)....................................................................21

*Sec. Ins. Co. v. Old Dominion Freight Line, Inc.*, 391 F.3d 77 (2d Cir. 2004) ...........................1

*Shebar v. Metro Life Ins. Co.*, 25 A.D.3d 858 (3d Dep't 2006)....................................18

*Tracy v. NVR, Inc.*, 737 F. Supp. 2d 129 (W.D.N.Y. 2010)........................................21

*Venizelos, S.A. v. Chase Manhattan Bank*, 425 F.2d 461 (2d Cir. 1970) ...........................21

*Wright v. Coughlin*, 132 F.3d 133 (2d Cir. 1998)..............................................2

**Statutes**

Fed. R. Civ. P. 56................................................................................................1,2

N.Y. GBL §349............................................................................................ 17-22

11 N.Y. C.R.R. §216.7..............................................................................6-8; 13

Plaintiff Nick's Garage, Inc. ("Plaintiff" or "Nick's") submits this brief in opposition to the motion for summary judgment brought by Progressive Casualty Insurance Company; National Continent Insurance Company; Progressive Advanced Insurance Company; Progressive Direct Insurance Company; Progressive Max Insurance Company; Progressive Northern Insurance Company; Progressive Preferred Insurance Company; and Progressive Specialty Insurance Company (collectively, "Progressive", "Defendant", or "Defendants").   Nick's has submitted a Response to Statement of Material Facts and Statement of Additional Material Facts In Dispute ("RSOF") and refers the Court to that submission for background facts referenced in this Memorandum. [1]

## ARGUMENT

Summary judgment is only warranted when "the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83) (2d Cir. 2004). For purposes of this inquiry, a fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Anderson*). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears the initial burden of showing that there is no genuine dispute of material fact with respect to any essential element of the claim; failure to do so warrants denying the motion. *See Anderson*, 477 U.S. at 250, n.4; *Sec. Ins. Co.*, 391 F.3d at

---

[1] Capitalized terms not defined herein shall have the meaning set forth in the RSOF.

83. If the moving party meets this burden, then the opposing party must demonstrate a dispute of material fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998) ("non-movant will have his allegations taken as true"). Entering summary judgment is only justified by a finding that no reasonable trier of fact could find in favor of the nonmoving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.2d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (holding that summary judgment is appropriate only where "there can be but one reasonable conclusion as to the verdict").

## POINT I
### THERE IS AN ISSUE OF MATERIAL FACT WITH RESPECT TO WHETHER PROGRESSIVE FULFILLED ITS CONTRACTUAL OBLIGATION

For a covered loss, Progressive may either pay for the loss in money, or repair or replace the damaged or stolen property.  RSOF¶67.

Progressive incorrectly asserts that it satisfied its contractual obligation because the vehicles were returned to pre-accident condition. Memorandum of Law in Support of Defendants' Motion for Summary Judgment, dated August 29, 2014 ("MOL") at 3, 4.  However, it is undisputed that in this case, Progressive elected to pay for the loss in money and did not actually perform the repairs or replace the property.  Statement of Material Facts, dated August 29, 2014  ("SOF"), ¶13; MOL: 4.  Therefore, the fact that the vehicles were repaired to pre-accident condition is irrelevant and does not determine the question of whether Progressive satisfied its contractual obligation.  Having elected to make payment, Progressive is contractually obligated to pay the amount reasonably necessary to return the First Party Assignors' vehicles to

2

pre-loss condition at the shop of the First Party Assignors' choice.  Response to Statement of Facts ("RSOF") ¶66.

A.  <u>Contractual Provisions Related to Progressive's Payment Obligations</u>

Progressive contracted that the labor rate it would pay would not be higher than "the prevailing competitive labor rates *charged* in the area where the property is to be repairs . . . as reasonably determined by [Progressive.]" RSOF¶66 (*emphasis added*).  Since neither insurers nor customers "charge" labor rates but instead *pay* labor rates, logically the reference to "labor rates charged" can only mean "labor rates charged by repair facilities."

Progressive also contracted that with respect to parts, it could use original equipment manufacturer parts (OEM), non-OEM parts, reconditioned parts, remanufactured parts, or used parts, *so long as those parts returned the vehicle to pre-accident condition.*  SOF¶11.  For the repairs at issue in this case, Nick's reasonably determined that the parts specified by Progressive would not return the vehicle to their pre-accident condition. Orso Decl. ¶40.  Contrary to Progressive's assertions, Nick's did not make a blanket determination that it would only ever use OEM parts, but instead made case-by-case determinations as to those parts.  Orso Decl. ¶40.

Progressive also claims that its policy excludes payments for overhead.  SOF¶63.  That exclusion does not appear among the exclusions and limitations in the policy.  Koshis Decl. Ex. B.  In any case, as set forth below, the charges that Progressive characterizes as overhead were not fixed costs but rather in each instance were charges resulting as a direct result of the repairs performed on the particular vehicle in question.  Therefore, they are part of the costs necessary to return the vehicle to pre-accident condition and are covered by the First Party Assignors' policies.

B.  <u>There is an Issue of Material Fact with Respect to Labor Rates</u>

There is an issue of material fact as to whether Progressive paid less than the prevailing competitive labor rates charged in Onondaga County, where the vehicles were repaired, for mechanical, frame, paint, and body labor.  RSOF¶66.  Progressive paid $44-$46 per hour for all of these different types of labor, with some estimates providing for a mechanical rate of $65 per hour.  RSOF¶66.  In contrast, a telephone survey of all repair facilities in Onondaga County by a Nick's expert showed that the average mechanical labor rate was $80.14, with more than 26% of shops charging $90 per hour or more.  RSOF¶66.  The survey showed average rates for frame, paint, and body repair that were similarly higher than what Progressive paid.  RSOF¶66.

Progressive has attempted to disguise this discrepancy between its rates and those found by the market survey by focusing on only one rate – body labor rate.  RSOF¶¶38-39; MOL:6-7.  However, repairs on the Assignors' vehicles included all of these different types of labor, and the deficiencies Nick's now seeks on behalf of the Assignors also include all of those different types of labor.  RSOF¶39.  To dismiss Nick's case, this Court must find that there is no issue of material fact with respect to *any* of the types of labor rates, not simply the body labor rate.

Progressive argues that in determining its labor rate, it followed the method laid out in its Labor Reference Guide, and that as a result, the rate it paid is the "prevailing competitive rate." SOF¶¶28-31; MOL:6-7.  There is an issue of material fact as to whether Progressive actually did follow its own methodology in order to reach the $44-$46 per hour labor rate figure.  RSOF¶¶28-31.

In any case, Progressive's process for determining labor rates is inherently flawed, and therefore unreasonable, because it is not designed to measure what *repair shops charge*, which is the contractual standard of Progressive's performance.  RSOF¶66.  Instead Progressive's process

4

measures what *insurers pay. Id.* One of Progressive's estimators, who is on the front lines dealing with shops every day, admitted that shops often charge an amount that is different than what Progressive pays. Lee Depo 221:2-5. Progressive itself admits that there can be a difference between what a shop charges and what it receives in payment. SOF¶40. Moreover, Progressive's method relies in part on other insurer's estimates, which only show what the insurers paid, and do not give any information as to whether or not the shop agreed to price. RSOF¶31. Progressive is attempting to redefine the "rates charged" by shops as the "rates paid by insurers", even though those two items are not the same thing. The method Progressive actually uses to determine its labor rate is materially different than the rate it says in its policy it will use.

For all of these reasons, there is an issue of material fact as to whether the labor rate Progressive paid was less than "the prevailing competitive labor rates *charged* in the area where the property is to be repairs," an issue of material fact as to whether Progressive complied with its own method of determining those rates, and an issue of material fact as to whether Progressive's methodology was reasonable. Progressive's motion to dismiss therefore should be denied.

C. <u>There is a Material Issue of Fact On The Other Elements of the Repairs</u>

There is a material issue of fact as to whether Progressive failed to pay the amount necessary to return the vehicle to pre-accident condition by writing their estimates using non-OEM, used, refurbished, and remanufactured parts.

Progressive's policy provision regarding use of non-OEM parts points does not change Progressive's underlying contractual obligation to return the vehicle to pre-accident condition. Kochis Decl. Ex. B. The policy provision Progressive cites does not give Progressive the right to

require the use a non-OEM part if the non-OEM part would not return the vehicle to its pre-accident condition in terms of fit form, finish, quality and performance.   11 N.Y.C.R.R. §216.7(5)(iii).

Here, it was Nick's assessment that the parts on Nick's final invoices were the ones that were necessary to return the vehicles to pre-accident condition, and that the parts specified by Progressive would not do so.  Orso Decl. ¶40.  Nick's assessment took into consideration what part was on the vehicle to begin with, as well as prior experience with the parts, and is based on solid reasoning.  Orso Decl. ¶¶30-40.  Moreover, the use of non-OEM parts often creates safety hazards for the consumer.  Avellini Decl. ¶¶12-14.  If a non-OEM part does not match the performance of the part that was on the vehicle before the accident, then by only paying for the non-OEM part, Progressive has failed to pay the amount necessary to return the vehicle to its pre-accident condition.

Progressive is free to dispute at trial Nick's assessment of what parts were necessary and demonstrate why the parts Progressive used in its estimate were, in fact, sufficient to repair the vehicles to their pre-accident condition.  That is precisely what *should* happen in this case, as the disagreement between Progressive and Nick's with respect to the parts used on the vehicle is an issue of material fact precluding summary judgment.

There also is a material issue of fact as to whether the operations Progressive omitted were reasonable charges for returning the vehicles to pre-accident condition.  RSOF¶71-76. Although Progressive asserts that its estimators are licensed appraisers, SOF¶20, the two adjusters who handled 39 of the 40 claims had *no* experience at all working for repair facilities. RSOF¶72.  In contrast, the two individuals writing estimates for Nick's had significant, practical,

hands on experience with car repair. RSOF¶72. Therefore, the judgment of Nick's estimators is credible evidence that the allowances on the invoice *were* reasonable amounts.

In addition, there is a material issue of fact as to whether the paint and material charges Plaintiff seeks are reasonable. RSOF¶73. Contrary to Progressive's assertions, Plaintiff uses an objective method, the Paintex software, to determine its paint and material charges. Orso Decl.¶80.

There are also material issues of fact with respect to a number of the additional service charges which Progressive challenges. Although Progressive characterizes these charges as "overhead", Nick's has asserted that they are directly related to the repairs at issue. Orso Decl.¶¶25-27. For example, the ALLDATA charges on Nick's bills were for searches performed to obtain vital technical information specific to the particular vehicle and repair being done. Orso Decl.¶¶10-24. In addition, Progressive refused to pay for hazardous waste disposal charges, even though despite the fact that Regulation 64 specifically lists hazardous waste disposal as an item for which the insurer should pay as a separate line item as part of the cost of repairing the vehicle to its pre-accident condition. 11 N.Y.C.R.R. §216.7(a)(9), (b)(4).

There is thus an issue of fact as to whether or not Progressive has failed to pay amounts reasonably required to repair the vehicle to pre-accident condition by failing to pay the amounts charged by Nick's for parts, labor allowances, paint and materials, and other service charges, and Progressive's summary judgment motion should be denied.

D.  There is Credible Evidence of Injury Precluding Summary Judgment

In addition, Nick's has shown a material issue of fact precluding summary judgment on the issue of injury on the breach of contract claim.

Progressive was required to pay the amount necessary to repair the vehicles to pre-accident condition, *even if no repairs were completed.*  11 N.Y.C.R.R. 216.7(b)(18). The measure of Progressive's obligation, therefore, is not whether or not the vehicle actually ended up in pre-accident condition, but whether or not Progressive paid the amount that was necessary to do return it to pre-accident condition.  SOF¶11; RSOF¶¶68-69 . Plaintiff has put in ample evidence which a reasonable trier of fact could find showed Progressive did not do that.  *Supra.* Because the First Party Assignors did not get the full benefit of their contractual bargain, they were injured.

The First Party's assignment of rights to Plaintiff did not alter or eliminate this injury. The second page of the Authorization of Repairs signed by the customers explicitly stated that the customers were responsible for the full cost of the repairs, regardless of what the insurer might or might not pay.  Orso Decl. Ex. D. Nick's had a valid contract claim against the First Party Assignors for the balance of the repair bill.  *Id.*  Nick's agreed to forgo its claims against the customer in exchange for the customer's assignment of her rights against Progressive to be paid the reasonable cost of repairing the vehicle to pre-accident condition.  Orso Decl. ¶70.  An assignment of a right does not destroy it; it merely entitles someone else (here, Nick's) to pursue the claim.

Accordingly, Nick's has submitted credible evidence for a reasonable trier of fact to show that the First Party Assignors were injured, and therefore summary judgment should be denied.


## POINT II
## PLAINTIFF'S LABOR RATE IS REASONABLE

There is an issue of material fact as to whether Nick's labor rates are reasonable.  There is significant evidence in the record that Nick's rates are reasonable.   Any arguments that

Progressive makes to the contrary simply illustrate the existence of a material issue of fact, which should be presented to the trier of fact at trial, who can then weigh the evidence after all of the witnesses have been put on the stand, their credibility assessed, their testimony put to cross-examination, and the documentary evidence put into context.

Nick's charged between $68 and $75 for body labor for the Assignors' repairs.  RSOF¶32. During the relevant time frame, numerous insurers paid Nick's rates similar to what Nick's charged Progressive. Orso Decl. ¶8, Ex.C.  In addition, Progressive itself paid $65/hour to Nick's for body work on at least one occasion in 2011.  Orso Decl. ¶44.  Progressive's accusation that Nick's charges Progressive and other insurers more than it charges to customers paying out of pocket is utterly unsupported by the record – indeed, the record shows the contrary.  RSOF¶62, Orso Decl. ¶¶6-10.

In addition, Nick's expert reports of its Harvard and Stanford educated economist, Dr. Frederic B. Jennings, further show that the labor rates Nick's charged to Progressive are reasonable.  Dr. Jennings analyzed the actual labor rates in Onondaga County, as determined by a professional survey performed by Abacus Associates to determine whether the actual collision rates existing were, in fact, a true reflection of fair market competitive labor rate.  Econologistics Final Report, dated January 13, 2014 ("Jen. Rpt."), *attached as* Exhibit B to the Declaration of Dr. Frederic B. Jennings, dated October 9, 2014, at 1.  Dr. Jennings performed his analysis using the tools and methods of transfer pricing, which as applied in this case involved in an industry market comparison between the collision repair industry and the mechanical repair industry, using the actual collision and mechanical rates in Onondaga County, New York.  Jen Rpt. 1, 4-6. As Dr. Jennings explains more fully in his report, the mechanical repair industry was chosen for a "control" test, because the mechanical repair industry is sufficiently similar to the collision

repair industry to serve as a useful comparable, but lacks the key variable whose influence Dr. Jennings was testing – the presence of auto insurers. Jen Rpt., 6-7. In other words, since mechanical repairs are primarily paid for by private-pay customers, the impact of insurer influence can fairly be found to be minimal on labor rates for mechanical repairs. Jen Rpt., 1, 4, 11.

Dr. Jennings compared the collision repair industry and the mechanical repair industry along a number of factors, including the (i) nature of the repairs performed by collision facilities versus mechanical repairs, (ii) the skills and training required of collision technicians versus mechanical technicians, (iii) the wages paid to collision technicians versus mechanical technicians, (iv) the equipment and other capital requirements of a collision facility versus that of a mechanical facility, (v) the risks that arise out of collision repair versus mechanical repair, and (vi) the economic conditions facing the two industries. Jen. Rpt. 6-8.

Relying in part on the expert report of Rocco Avellini, Dr. Jennings noted that in virtually every factor, collision repair was more difficult, more expensive, riskier, and generally had higher input costs than mechanical repair. For example, Dr. Jennings observed that collision work involved customized work, since every crash is a little bit different and the damage that results from that damage is a little different. Jen.Rpt.10. In comparison, mechanical repair was primarily a "bolt-on, bolt-off" type of repair, as Mr. Avellini observed. WreckCheck Car Scan Centers Collision Repair Facility v. Mechanical Repair Facility report (WR Rpt.), attached as Exhibit B to the Declaration of Rocco Avellini, dated October 9, 2014 ("Avellini Decl."), p.11. In general, collision technicians were required to have a wider breadth of knowledge than mechanical technicians. Jen.Rpt.10; WR Rpt.11. Relying on U.S. Bureau of Labor Statistics, Dr. Jennings observed that collision technicians are in fact paid more than mechanical

technicians, which supported the assessment that collision technicians had more skill and training requirements than mechanical technicians.  Jen.Rpt.10.

In addition, collision repair facilities require greater capital investment than mechanical facilities.  Although the typical repair bay stall is the same size for both, a collision facility needs more room to accommodate delays in the repair caused by the inspection and re-inspection process, which results in down time of repairs.  WR Rpt. 7.  The collision facility needs to have a separate portion of the facility dedicated to the paint refinishing booth and the paint mix room, which also increases the physical amount of space it needs.  WR Rpt.7.  A collision repair facility needs substantial additional equipment, including expensive items such as frame machines and paint booths, which also contributes to the increased capital cost for a collision facility.  WR Rpt. 7, Exs. 3-4.  *See* Jen.Rpt.3, 6.

As a result of this comparison, Dr. Jennings found that the true collision labor rate "that would prevail in transactions between independent economic agents on a level, competitive field in a free and fair market setting" for Onondaga County would actually be *higher* than then existing mechanical labor rate for Onondaga County.  Jen Rpt. 2.  The average mechanical rate in Onondaga County for September 2013 was $80.20. Jen.Rpt.8.  Dr. Jennings then derived what that would be for the months and years in question in this suit, to come up with average mechanical labor rate of $79.40 to $81.97 for the years in question.  JenRpt. 11, Ex.6.  Since in Dr. Jennings' view the true competitive collision labor rate that would exist in the absence of insurer suppression would be equal to or higher than the mechanical rate of approximately $80/hour, Nick's labor rates at $68-$75 were reasonable market rates.  Jen.Rpt. 8-11; Dr. Jennings' Rebuttal of "Expert Report of Lauren J. Stiroh, Ph.D. dated July 2, 2014 ("Reb.Rpt."), *attached as* Exhibit C to the Jennings Decl., p.8.

As was set forth more fully in Plaintiff's briefing in the summary judgment motion in the related case, *Nick's Garage, Inc. v. Nationwide,* the correct standard for measuring whether Progressive fulfilled its contractual obligation is whether or not Nick's charges were reasonable, not whether or not Progressive's charges were reasonable.  Permitting an insurer to refuse to pay the reasonable charges of the shop of the customer's choice simply because they fall a little higher in the range of reasonable, would compromise the customer's right to select the repair shop of their choice.  *See gen. Rizzo v. Merchants and Businessmen's Mut. Ins. Co.*, 188 Misc.2d 180, 182-183 (Sup. Ct., App. Term 2001).

Here, Nick's was the shop of choice of the Assignors.  *See gen.*  Can. Decl. Ex.M toV. Since there is a material issue of fact as to whether Nick's charges were reasonable, summary judgment should be denied.

## POINT III
## DEFENDANT HAS ENGAGED IN DECEPTIVE PRACTICES

Progressive claims to be writing its estimates to return Assignors' vehicles to pre-loss condition.  However, Progressive's practices demonstrate that Progressive is treating drivability and superficial appearances as being equivalent to "pre-loss condition" rather than complying with their actual obligation to return the vehicle to its pre-loss condition with respect to all aspects of its condition, form function, safety and appearance of the vehicle.  The policy and practice of writing estimates to a lower standard while pretending to be meeting the pre-loss condition standard is a deceptive practice.

Returning a vehicle to pre-accident condition requires attention to the form, function, safety and appearance of the vehicle.  Orso Decl. ¶81; *see also* 11 N.Y.C.R.R. 216.7(b)(5). Many of the ways in which a vehicle might not match the prior condition in terms of function

and safety are not readily apparent to a consumer simply looking at the vehicle or, in some cases even driving it.  For example, when a part is not welded using the same weld spots specified by the manufacturer, the structural integrity and crash-worthiness of the vehicle is compromised and is not the same as pre-accident condition.  Orso Decl. ¶14.   Yet by allowing insufficient labor allowances, Progressive is putting pressure on shops to cut corners and not follow proper repair procedures, such as correct welding procedures.  *See* Av. Decl.¶¶8-11; Orso Decl. ¶42.   Non-OEM bumpers and fenders often are made of different materials or have a different number of fasteners than non-OEM bumpers, which affects the performance of the bumper in a crash, and which in turn can affect the deployment of air bags.  Av. Decl. ¶¶12-14; Orso Decl. ¶32.  A poor paint job in some cases is not obvious at the time the car is returned to the customer, but becomes apparent when the paint fails to weather normal conditions as it should.  *See, e.g.* Orso Decl. ¶52.  A customer cannot generally see these differences at the time that the customer picks up the vehicle.

Progressive misled its customers to believe that their vehicles would be repaired properly, and that Progressive would negotiate in good faith in order to do that.  RSOF ¶79.  In the forty claims at issue here, Progressive uniformly failed to pay attention to such concerns and the numerous others, and refused the amounts Nick's believe was necessary to return the vehicles to pre-accident condition.  Orso Decl. ¶¶77-79.   Whatever Progressive's stated policy may be, its practice seems to be to write estimates and encourage shops to repair vehicles to a lower standard of drivability and superficial appearance, rather than writing estimates for actual pre-loss condition. Orso Decl. ¶68.  Progressive engaged in a pattern and practice of doing something different than what it had led its customers to believe it would do.  That constitutes a deceptive practice.

13

In fact, it is Progressive's position that if another facility would honor its estimate, then it does not have to pay the amount at another facility, like Nick's. Stala Dep 217-218:23-7. Thus, Progressive is limiting the amount that it will pay to the amount it believes it could obtain at another facility. *See id.* A requirement that a customer pay out-of-pocket for the difference between the reasonable charges at the repair shop of the customer's choice and what Progressive says another repair shop would do the repair at, is in contravention of a customer's right to choose their own repair shop. *Rizzo v. Merchants and Businessmen's Mut. Ins. Co.*, 188 Misc.2d 180, 182-183 (Sup. Ct., App. Term 2001). By so doing, Progressive has misled its customers about having a choice of repair shop. RSOF¶79.

Progressive also has engaged in a deceptive practice by determining its labor rate in a method other than what is set forth in the insurance policy and its own Labor Rate Reference Guide. Progressive's policy asserts that it will pay the amount prevailing competitive rate that shops are *charging* in the area, but in fact, its official process for determining labor rates is designed to determine the rates that shops "accept" as Progressive defines "accept". RSOF¶80.

To show what shops "accept", Progressive points to testimony that it consistently reaches agreed prices with other shops for its rates. MOL:6, *citing* SOF¶28-29. Testimony established that Progressive's electronic claims notes system has an entry for adjusters to indicate whether or not an agreed price has been reached. Stala Dep. 270:18-25. Progressive's system will not allow the adjuster to submit the note for the claim if the agreed price box was checked "no", and as a result Progressive's adjuster marked in the system that an agreed price had been reached *even when it had not*. Stala Depo. 270:18-25.

Moreover, Progressive did not follow its own method for determining when agreed prices had been reached. Progressive's stated method for determining what constitutes an "agreed

14

price" is for its adjusters to negotiate the rates on a case by case basis with the shops. DeLuca Depo. Ex. 4 (Can. Decl. Ex.D). Yet Progressive's adjusters Corey Lee and David Stala, who handled 39 of the 40 claims in this case, both stated that they did not discuss labor rates with shops, that they had nothing to do with setting the labor rates, and that before they would override the labor rate which was pre-loaded into their software, they would discuss it with a manager. RSOF¶28.

Indeed, it is difficult to understand what a shop would have to do to indicate that it did *not* agree to the price. Apparently, even Nick's procedures of sending notices of deficiencies and asserting in writing that Nick's did not agree to Progressive's rate was not enough for Mr. Stala to indicate in the claims system that there was no agreed price. Orso Decl. Ex.E; Stala Depo. 270:18-25. Progressive's adjuster Corey Lee testified that shops frequently charged different rates on their estimates than what Progressive writes for. RSOF¶28. Yet, Mr. Lee testified, he continues to pay on the basis of his pre-loaded rate. RSOF¶28. In the absence of any willingness on the part of Progressive to actually negotiate to its labor rate, its classification of the prices it paid as being agreed prices is highly questionable. In fact, Nick's expert, Dr. Jennings, contests Progressive's description of its labor rate as being set by a competitive, free market. Reb.Rpt.7-8. Dr. Jennings stated that "no specific evidence is offered to found this claim upon data that are sufficiently identified and justified to show these labor rates were accepted by ACR shops." *Id.*

Progressive asserts that Nick's cannot show deceptive practice because Nick's continues to take this work, knowing what rates Progressive is willing to pay. MOL:16-17. Progressive's argument is essentially that if Nick's does not like Progressive's rates, Nick's should simply stop doing work for Progressive customers. In essence, even on this motion, Progressive is setting

forth a "take it or leave it" attitude which is completely at odds with its stated policy of negotiating rates.

Progressive has an obligation, both contractual and under the insurance regulations, to negotiate in good faith on labor rates, which it *does not do*. *See supra*. Progressive is essentially arguing that Nick's should cede the field to it, and quit demanding that Progressive do what it is obligated to do. Nick's could not remain in business if it followed that advice, because the vast majority of work in the collision industry is insurer-paid. Orso Decl.¶83-84. This harms not only Nick's, but also the consumer, whose right to take the vehicle to the repair shop of the customer's choice is compromised. *See supra* Orso Decl.¶83-84. Numerous customers in this case are on record saying that Nick's was their shop of choice and that they did not want to take their vehicle to one of Progressive's preferred shops. Can. Decl. Ex. M-V. Progressive would deny them that choice by asserting that regardless of whether or not Nick's charges are reasonable, Progressive should not be obligated to pay them.

There is a material issue of fact as to whether Progressive in practice unilaterally dictates labor rates, rather than negotiating them as Progressive claims it will do. This constitutes a deceptive practice.

Moreover, when Progressive dictates the same price to all shops in Onondaga County, it is difficult to characterize Progressive's rate as "competitive". There is nothing "competitive" about a process where Progressive gives a price to all shops, and refuses to negotiate with them on rates.

Therefore, there is an issue of material fact as to whether or not Progressive's practice in setting labor rates differed from the method set forth in its standard form policy issued to customers, thereby constituting a deceptive practice.

16

A. Defendant Fails to Negotiate Labor Rates

In addition, there is an issue of material fact as to whether Progressive has engaged in a deceptive practice by failing to negotiate labor rates in good faith. For Progressive to fulfill its good faith negotiation obligation, Progressive *must* negotiate labor rates. This was made clear by the Insurance Department.

> "Question: . . .2. Must an insurer, as part of a good faith negotiation, negotiate labor rates?. . . Conclusion: Yes. A good faith negotiation, like a good faith settlement offer, should be inclusive of all elements of the cost of the repair, including labor rates."
> OGC Op. NO. 08-07-09, Can. Decl. Ex. __

Progressive points to an opinion letter of the insurance department that asserts that an insurer is not required to move from its initial settlement position. MOL:12. However, the rule only applies *if the initial offer is taken in good faith.* OGC Op. No. 08-12-09, Can. Decl. Ex. __. It is Nick's position that Progressive's position on labor rates was *not* taken in good faith, and therefore Progressive's failure to negotiate is a deceptive practice.

## POINT IV
## GBL 349 INJURY

Progressive's reliance on the *Spagnola v. Chubb Corp*, 574 F. 3d 64, 74 (2d Cir 2009) ("*Spagnola*") case to claim that Plaintiff cannot show injury on the GBL 349 claims is misplaced. Progressive cites *Spagnola* for the erroneous proposition that Nick's cannot bring a GBL 349 claim for injuries arising out of conduct which is also a breach of contract.

In the related *Nick v. Nationwide* case, Nick's submitted briefing to the Court arguing that the *Spagnola* case does not stand for the proposition for which Progressive cites it, which is fully applicable here as well. As more fully set forth therein, the rationale of the *Spagnola* court supports Nick's GBL 349 claims here. The Second Circuit in *Spagnola* dismissed the plaintiff's GBL 349 claims because the plaintiff did not allege a failure by the insurer to provide the

17

benefits under the insurance contract. *Spagnola*, 574 F.3d at 74 ("Spagnola does not claim that he did not receive adequate insurance coverage or that he did not contract for the coverage he received.")

The rule which Progressive cites is at odds with subsequently decided New York Appellate Division precedent. *Spagnola* was decided in 2000; since that time, a host of New York state court cases have found allowed GBL 349 actions to co-exist with breach of contract claims under insurance policies where the plaintiff alleges that the insurer did not actually provide the benefit under the insurance contract. *Joannou v. Blue Ridge Ins. Co.*, 289 A.D.2d 531, 531 (2d Dep't 2001) ("An insurance carrier's failure to pay benefits allegedly due its insured under the terms of a standard insurance policy can constitute a violation"); *Shebar v. Metro Life Ins. Co.* 25 A.D.3d 858, 859 (3d Dep't 2006) (GBL 349 claim and breach of contract allowed to challenge benefits); *Makuch v. N.Y. Cent. Mut. Fire Ins. Co.*, 12 A.D.3d 1110, 1111 (4th Dep't 2004)(allegations that defendant-insurer partially disclaimed coverage supported GBL 349 claim, as well as the undisputed breach of contract); *see also Beller v. William Penn Life Ins. Co. of N.Y.*, 8 A.D.3d 310 (2d Dep't 2004) (plaintiff stated causes of action for breach of contract and GBL 349 violations by alleging that defendant increased rates without regard to factors set forth in policy, but finding most claims time-barred); *Acquista v. N.Y. Life Ins. Co.*, 285 A.D.2d 73, 78-80 (1st Dep't 2001) (plaintiff stated a cause of action for breach of contract and GBL 349 on the basis of the insurer's practice of delaying claims and denying viable claims).

Here, all four departments of the New York Appellate Division have found that a GBL 349 claim may co-exist with a breach of contract claim on an insurance policy. *Id.* In light of the uniformity of New York Appellate Division departments on this issue, and the fact that these decisions were decided subsequent to *Spagnola*, even if the Court rejects Nick's interpretation of

18

*Spagnola*, under the *Erie* doctrine the law of the New York Appellate Division rule cases should apply and Nick's claims should be allowed.

## POINT V
## THERE IS CONSUMER IMPACT

Progressive is also incorrect in asserting that there is no consumer impact to Progressive's actions in improperly suppressing the amounts paid for repairs.  There is ample evidence set forth on this motion that the suppression of labor rates, the pressure to use non-OEM parts, and the insufficient time allowances reduces the quality of repairs in the industry as a whole by pressuring shops to cut corners and by leading shops to place improperly repaired cars on the road which fail to give consumers the same level of safety as existed pre-loss.  Orso Decl. ¶42; Declaration of Rocco Avellini, dated October 10, 2014 ("Av. Decl.").

In addition, here Progressive has entered into a standard form contract with its policy-holders.  *See*  Kochis Decl. Ex.B.   As this Court has already held in this case, this suffices to meet the consumer-oriented prong of this case.  Memorandum-Decision, Dkt. 22, at p.15. Progressive's motion for summary judgment should be denied.


## POINT VI
## NICK'S HAS STANDING

Progressive's arguments that Nick's lacks standing to bring its GBL § 349 claims on behalf of either the First or Third Party Assignors fail as well.  *See, e.g.,* MOL:20-22. As a preliminary matter, the assignments did assign the claims to Nick's Garage, Inc., using the registered assumed name of Nick's Garage, Inc.  RSOF¶66.

Progressive incorrectly argues that the GBL 349 claims are barred since the Third Party Assignors cannot sue Defendants in contract. MOL:21.  However, a GBL 349 claim is a statutory

19

tort claim, not a contract claim. *See gen. Louis Capital Mkts, L.P. v. REFCO Grp. Ltd., LLC*, 9 Misc.3d 283, 288 (N.Y. Sup. 2005) (noting that New York courts have long recognized the common law tort of unfair business practices, and noting that in that case the plaintiff had pled the common law tort rather than GBL 349). Progressive appears to concede this point by citing law regarding the assignment of tort claims. MOL:21. Progressive's argument regarding contract claims is entirely disposed of by the New York Appellate Division's recent holding in *Nick's Garage v. Liberty Mutual Fire Insurance Company*, No. 13-01497, 2014 WL 3882669 (4th Dep't Aug. 8, 2014), which was in accord with this Court's previous opinion in this case. Can. Decl. Ex. 4; Memorandum-Decision and Order, at 20, Dkt.22.

Contrary to Progressive's assertions, the scope of the assignments given by the Third Party Assignors to Nick's includes both (a) claims against Progressive, rather than just Progressive's insureds, and (b) the GBL 349 claims. The second of the two assignment forms signed by the Third Party Assignors, the Assignment of Property Damage Claim Only, assigns not only claims against the identified insured, but also claims against "any other person or entity arising out of or relating directly or indirectly to damage done to or suffered by Assignor's motor vehicle on/or about [the date of loss]." Orso Decl. ¶72, Ex. H. This language easily includes claims against Progressive directly for GBL 349 violations occurring in the context of Progressive's handling of the claims process for the damage done to the Third Party Assignors' vehicles.

In addition, the Third Party Assignors *also* signed the Authorization for Assignment of Proceeds and Repairs. Orso Decl. ¶70, Ex.G. Progressive incorrectly argues that this assignment should be interpreted as applying only to First Party claims, on the basis that the assignment contains some language about premiums. MOL:21. The argument is non-sensical –

whatever it was "intended" for (which Nick's disputes), it was signed by the Third Parties. Progressive's would have this Court render the agreements a nullity on the basis of a reference to premiums. MOL:20-21.  An interpretation rendering an agreement unenforceable is disfavored and should be rejected in this case. *Robert J. McRell Assocs., Inc. v. Ins. Co. of N. Am.*, 677 F. Supp. 721, 727 (S.D.N.Y. 1987) (citing *Venizelos, S.A. v. Chase Manhattan Bank*, 425 F.2d 461, 65 (2d Cir. 1970)); *A. Cappione, Inc. v. Cappione*, 119 A.D.3d 1121, 1121, 990 N.Y.S.2d 297, 299 (3d Dep't 2014); *Tracy v. NVR, Inc.*, 737 F. Supp. 2d 129, 132 (W.D.N.Y. 2010).

Finally, under the Second Circuit precedent cited by Progressive, the Authorization for Assignment of Claim and Proceeds form, which was signed by *both* the Third Party and First Party assignors, does include GBL 349 claims within its scope, as does the Assignment of Property Damage Claim Only form. *See Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 151 (2d Cir. 1995) (*"Banque Arabe"*).

In *Banque Arabe*, the Second Circuit held that the assignment document at issue there had adequately assigned causes of action sounding in tort as well as contract. *Banque Arabe*, 57 F.3d at 151.  The court observed that "New York law does not require specific boilerplate language to accomplish the transfer of causes of action sounding in tort.  Rather, 'any act or words are sufficient which show an intention of transferring the chose in action to the assignee.'" *Id.* at 151-52 (quoting *Miller v. Wells Fargo Bank Int'l Corp.*, 540 F.2d 548, 557 (2d Cir. 1976)). It was ultimately persuaded by assignment language that specifically purported to transfer "all 'rights, title and interest,'" held by the assignors not only to the agreement itself, but to the transaction at issue:

> We construe this interest in the 'transaction' to be broader than an interest in the contract, and we predict that the New York Court of Appeals[2] would deem this language sufficient to effect the assignment of tort claims based on fraud.

---

[2] The New York Court of Appeals has not since taken up this issue.

*Id.* at 152; *see also Pro Bono Inv., Inc. v. Gerry*, No. 03 Civ. 4347, 2008 WL 4755760 (S.D.N.Y. Oct. 29, 2008), at *18 ("*Banque Arabe* thus reflects that the default rule in New York for broadly worded assignments that do not contain limiting language or purport to transfer only contract rights, is that such assignments include causes of action, although they may not refer to them explicitly.").

Here, like in *Banque Arabe*, the Authorization, which both First and Third Party Assignors executed, purport to assign an interest in the transaction itself – the insurance <u>claim</u> – rather than just rights under the insurance agreement.  Orso Decl. Ex. G & H.  As a result, under *Banque Arabe*, the Assignments and the Authorizations were sufficiently broad to assign the assignors' GBL § 349 claims to Plaintiff.  *See also O'Brien v. Argo Partners, Inc.*, 736 F. Supp. 2d 528, 535 (E.D.N.Y. Aug. 23, 2010) ("The sentence in the Purchase Agreement which states that O'Brien 'agrees to remit to Assignee any future distribution it receives from the Estate on this Claim' provides evidence that O'Brien manifested his intent to assign <u>all rights that might arise in the future in connection with this claim</u>." (emphasis added)).

## POINT VII

## PROGRESSIVE'S DOUBLE HEARSAY SHOULD NOT BE ADMITTED

Finally, Plaintiff objects to the inclusion of Exhibit N to the Kochis Declaration in the record and asserts that it should not be considered on this motion.  The document is inadmissible because it contains double hearsay.  Its certification as a business record does not resolve this

issue. Double hearsay is not admissible unless each level of hearsay is covered by an exception to the hearsay rule. *Lewis v. Velez*, 149 F.R.D. 474, 477 (S.D.N.Y. 1993).

The Labor Rate Request itself is the first level of hearsay, as it purportedly records an investigation into labor rates by a Progressive employee. At best, the certification of the document as a business record covers only this level of hearsay. However, within it, the document contains information allegedly obtained from body shops regarding the rates those body shops allegedly "accept", however, Progressive defines that term. Progressive appears to be offering them for the truth of the labor rates allegedly reported by the body shops which are reported therein, which makes the statements therein regarding rates double hearsay. The document is therefore inadmissible. *See Agricultural Ins. Co., Inc. v. Ace Hardware Corp. et al.*, 214 F.Supp.2d 413, 415-416 (S.D.N.Y. 2002) (document inadmissible under the business records exception in Rule 803(6) because it contained double hearsay, although it was admitted under another exception).

There are significant questions with the way that Progressive conducted this labor rate. Mr. Beney and Mr. DeLuca were only able to testify in general terms as to what Progressive's policy was for conducting labor rate reviews, but did not have any personal knowledge of how the purported investigation into labor rates in Onondaga County actually occurred (if it occurred). The document contains a statement that Nick's Garage accepted $46/hour during this time frame, which creates a reliability question in and of itself, since Nick's clearly habitually wrote its estimates for more than that. Even if Progressive could somehow show a single estimate by Nick's on that date that contained that rate, that would only further call the credibility of the document into question as purported evidence of labor rates, since such a scenario would

suggest Progressive was simply picking the lowest estimate it could find for a shop, even if that estimate was an aberration.

In light of these issues, Exhibit N should not be considered as it is inadmissible double hearsay and lacks sufficient indicators of reliability.

## CONCLUSION

Plaintiff Nick's respectfully submits that Progressive's motion should be denied and Nick's be granted such other and further relief as the Court deems just and equitable.

Dated: October 10, 2014     BOUSQUET HOLSTEIN PLLC


         */s/* Cecelia R.S. Cannon, Esq.
         Cecelia R.S. Cannon, Esq.
         Bar Roll No. 515626
         Attorneys for Plaintiff
         110 West Fayette Street, Suite 900
         Syracuse, New York 13202
         Telephone: (315) 422-1391


2354503_1.docx