**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**NICK'S GARAGE, INC.,**

                              **Plaintiff,**

    **vs.**                                               **5:12-cv-777**
                                                          **(MAD/DEP)**

**PROGRESSIVE CASUALTY INSURANCE**
**COMPANY; NATIONAL CONTINENTAL**
**INSURANCE COMPANY; PROGRESSIVE**
**ADVANCED INSURANCE COMPANY;**
**PROGRESSIVE DIRECT INSURANCE COMPANY;**
**PROGRESSIVE MAX INSURANCE COMPANY;**
**PROGRESSIVE NORTHERN INSURANCE**
**COMPANY; PROGRESSIVE PREFERRED**
**INSURANCE COMPANY; AND PROGRESSIVE**
**SPECIALTY INSURANCE COMPANY,**

                              **Defendant.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

**BOUSQUET HOLSTEIN PLLC**                 **CECELIA R. CANNON, ESQ.**
100 West Fayette Street, Suite 900         **LAWRENCE M. ORDWAY, JR., ESQ.**
Syracuse, New York 13202
Attorneys for Plaintiff

**NELSON, LEVINE, DE LUCA &**              **KYMBERLY KOCHIS, ESQ**
**HAMILTON**
One Battery Park Plaza – 32nd Floor
New York, New York 10004
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

On March 30, 2012, Plaintiff commenced this suit in New York State Supreme Court, in Onondaga County.  *See* Dkt. No. 1.  In the complaint, Plaintiff asserts claims of breach of contract, *quantum meruit*, and violations of New York General Business Law § 349.  *See* Dkt. No. 1-1.  On May 10, 2012, Defendant Progressive Casualty Insurance Company, initially the only named defendant, removed the action to this Court based upon diversity of citizenship.  *See* Dkt. No. 1.  Defendant made a motion to dismiss, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *See* Dkt. No. 7.  The Court dismissed Plaintiff's *quantum meruit* cause of action and those General Business Law claims that were barred by the three-year statute of limitations, but Plaintiff's cause of action for breach of contract and the remaining General Business Law claims were permitted to go forward.  *See* Dkt. No. 22.  Defendant Progressive Casualty Insurance Company filed an answer on March 13, 2013.  *See* Dkt. No. 23.  Subsequently, Plaintiff, by leave of Court, filed an amended complaint naming Progressive Casualty Insurance Company together with National Continental Insurance Company, Progressive Advanced Insurance Company, Progressive Direct Insurance Company, Progressive Max Insurance Company, Progressive Northern Insurance Company, Progressive Preferred Insurance Company, and Progressive Specialty Insurance Company (collectively "Defendant").  *See* Dkt. No. 35.  Defendant filed an answer on October 23, 2013.  *See* Dkt. No. 39.[1]

---

[1] The Court notes that there are currently six other cases pending which share an identity of issues to the present matter.  *See Jeffrey's Auto Body, Inc. v. State Farm Gen. Ins. Co.*, No. 5:12-cv-635 (MAD/DEP); *Nick's Garage v. State Farm Fire and Casualty Ins. Co.*, No. 5:12-cv-633 (MAD/DEP); *Nick's Garage, Inc. v. Nationwide Mut. Ins. Co.*, No. 5:12-cv-868 (MAD/DEP); *Jeffrey's Auto Body, Inc. v. Progressive Casualty Ins. Co.*, No. 5:12-cv-776 (MAD/DEP); *Jeffrey's Auto Body, Inc. v. State Farm Fire and Casualty Ins. Co.*, 5:13-cv-1218 (MAD/DEP); and *Nick's Garage, Inc. v. State Farm Fire and Casualty Co.*, 5:13-cv-1217 (MAD/DEP).

Currently before the Court are Defendant's motion for summary judgment brought pursuant to

Rule 56 of the Federal Rules of Civil Procedure and Defendant's three motions to strike portions

of Plaintiff's opposition papers. *See* Dkt. Nos. 98, 100, 106.

## II. BACKGROUND

Plaintiff, a corporation with its principal place of business in New York, is an automobile

repair shop located in Syracuse, New York. *See* Dkt. No. 88 at ¶¶ 1-2. Defendant consists of

insurance companies that are each engaged in the business of selling auto insurance policies in

New York. *See id.* 88 at ¶ 3.

From 2007 through 2011, respective vehicles, described by their vehicle identification

numbers ("VIN") in Plaintiff's amended complaint, suffered property damage. *See* Dkt. No. 35 at

¶ 15. Property damage claims were eventually submitted to Defendant by the respective owners

of the vehicles. *See* Dkt. No. 88 at ¶¶ 6-7. Each of the vehicles was repaired at Plaintiff's auto

collision repair shop. *See* Dkt. Nos. 86-5, 86-6, 86-7, 86-8. According to Plaintiff, these

customers fall into two categories, the "First-Party Assignors" and the "Third-Party Assignors"

(collectively, the "Assignors"). *See* Dkt. No. 88 at ¶¶ 8-9 Although the theories of recovery differ

for these two types of assignors, Plaintiff alleges that Defendant was obligated to repair the

vehicles of all of the Assignors to their pre-accident condition. *See* Dkt. No. 35 at ¶ 19.

The first twenty-nine of the forty property damage claims – by twenty-six assignors –

listed in paragraph fifteen of Plaintiff's amended complaint belong to the First-Party Assignors,

*i.e.*, the owners of the vehicles that Plaintiff repaired were auto insurance policy holders with

Defendant at the time of the property damage and repairs. *See id.* at ¶ 16; Dkt. No. 88 at ¶ 6. The

remaining eleven property damage claims in the amended complaint belong to the Third-Party

Assignors, *i.e.*, these vehicles were damaged by automobile insurance policy holders of Defendant.  *See* Dkt. Nos. 35 at ¶ 18; 88 at ¶ 7.

All of the Assignors brought their vehicles to Plaintiff for repairs after being damaged during accidents.  *See* Dkt. Nos. 74-6; 74-7; 74-8.  Each of the Assignors made Plaintiff his or her "designated representative" pursuant to New York regulation.  *See* Dkt. No. 86-14.  A designated representative is authorized to negotiate with an insurer on behalf of a customer for repairs to a vehicle.  *See* 11 N.Y.C.R.R. § 216.7(a)(2).  In addition to the designated representative authorization, all the Assignors signed an authorization and guideline for repairs, *see* Dkt. No. 86-4, and a consumer consent, *see* Dkt. No. 86-13.  All the First-Party Assignors signed an authorization for assignment of claim and proceeds.  *See* Dkt. No. 74-5.  All the Third-Party Assignors signed both an authorization for assignment of claim and proceeds form and an assignment of property damage claim only form.  *See* Dkt. Nos. 74-6, 74-7.

In connection with each vehicle, Plaintiff sent Defendant an estimate of the repairs necessary to return the vehicles to their pre-accident condition.  *See* Dkt. No. 35 at ¶ 22.  Defendant then submitted estimates to Plaintiff, which Plaintiff claims were insufficient to restore the vehicles to their pre-accident condition.  *See id* at ¶¶ 23-24; Dkt. Nos. 86-5; 86-6; 86-7; 86-8.  Thereafter, Plaintiff contends that it served upon Defendant notices of deficiencies informing Defendant "that there were omitted and/or insufficient items and that an agreed upon amount had not been reached for the repairs[.]"  *See* Dkt. Nos. 35 at ¶ 32; 86-5; 86-6; 86-7; 86-8.  Defendant contends that each of the vehicles at issue were repaired and restored by Plaintiff to the vehicle's pre-accident condition, without the vehicle owners having to pay any money out of pocket, other than any deductible owed by the First-Party assignors.  *See* Dkt. No. 73.  Plaintiff admits that the vehicles were repaired to their pre-loss condition and that the First-Party Assignors were

4

responsible for any deductibles, but Plaintiff denies that it was not owed for the cost of repairs beyond what Defendant reimbursed.  *See* Dkt. Nos. 35 at ¶¶ 19, 35, 42; 88 at ¶ 11.

Plaintiff contends that the First-Party Assignors were in privity of contract with Defendant, and Defendant was required by the listed insurance policies "to provide enough coverage to restore the Vehicles to the same condition they were in immediately prior to the Accidents."  *See* Dkt. Nos. 88 at ¶¶ 6; 87-9.  Plaintiff claims that the First Party-Assignors assigned their rights under the specified policies to Plaintiff.  *See* Dkt. No. 35 at ¶ 19, 30.  Plaintiff's first cause of action contends that Defendants breached the policies by providing an insufficient estimate to return the vehicles to their pre-accident condition and that Defendants owe Plaintiff $70,642.18 for the deficiencies on the First-Party assignments.  *See id.* at ¶ 41.

As to the Third-Party Assignors, Plaintiff repaired their vehicles, which were not directly insured by Defendant.  *See* Dkt. No. 88 at ¶ 7.  Rather, these vehicles were damaged by drivers who were insured by Defendant.  *See id*.  Defendant's contractual relationship was with its tort-feasor insured, not with the Third Party Assignors, and, according to Plaintiff, Defendant accepted liability on behalf of its insured for the repairs to the Third Party Assignors' vehicles by making partial payment for the claimed repairs.  *See* Dkt. No. 35 at ¶ 18.  Plaintiff claims that the assignments by the First-Party and Third-Party Assignors included the right to bring claims against Defendants under New York State General Business Law § 349, which is Plaintiff's second cause of action.  *See* Dkt. No. 35 at ¶¶ 46-57.

In its second cause of action, Plaintiff maintains thirty-two assigned claims against Defendant.  *See* Dkt. No. 35 at ¶¶ 46-55.  Plaintiff contends that Defendant limited the costs it would cover to repair the vehicles to less than the full amount necessary to repair the vehicles to their pre-accident condition.  *See id.* at ¶¶ 47-49.  Plaintiff contends that "Defendant's limitation of

costs was a material deceptive action because it knew when it made its limitation that it was not providing the full amount necessary" and that Defendant's failure to negotiate all elements of the specified claims was a deceptive business practice within the meaning of New York General Business Law § 349 ("GBL § 349"). *See id.* at ¶¶ 50-54. As such, Plaintiff alleges that it is entitled to damages in the amount of $73,776.59, plus reasonable attorneys' fees, on its second cause of action. *See id.* at ¶ 57.[2]

In their motion for summary judgment, Defendant argues that the Court should dismiss Plaintiff's first cause of action because its process for determining labor rate is sound, it is not contractually obligated to pay for overhead expenses and original parts, its paint and material charges were not arbitrary and speculative, and Plaintiff has not put forth any evidence that there was a deficiency in labor hours. *See* Dkt. Nos. 74; 104. Further, Defendant argues that Plaintiff is not entitled to damages for any alleged breach of the auto insurance contracts because Plaintiff cannot prove that the Assignors suffered any loss or damage arising from any alleged breach of the auto insurance contracts. Defendant contends that proving the existence of damage caused by an alleged breach of a contract is an essential and required element of proving a breach of contract action under established New York contract law. *See* Dkt. No. 73.

---

[2] Plaintiff's original complaint alleged an amount in controversy slightly in excess of $75,000, while Plaintiff's amended complaint alleges damages of $73,776.59. The dismissal of eight GBL § 349 claims as barred by he statute of limitations, which reduced the alleged damages below the $75,000 necessary for diversity jurisdiction, does not deprive the Court of subject-matter jurisdiction. *See Ryan v. Cerullo*, 343 F. Supp. 2d 157, 159 (D. Conn. 2004) ("It is well settled that once a federal district court's jurisdiction has attached to a case removed from state court, a plaintiff cannot deprive the district court of jurisdiction by reducing his claim below the requisite jurisdictional amount 'by stipulation, by affidavit, or by amendment of his pleadings'" (quoting *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 292–93, (1938)); *see also Gucciardo v. Reliance Ins. Co.*, 84 F. Supp. 2d 399, 404 (E.D.N.Y. 2000) (citations omitted).

As to the second cause of action, Defendant argues that Plaintiff cannot prove that Defendant engaged in deceptive or misleading practices in its estimates and claims handling associated with the thirty-two insurance claims and the corresponding vehicle repair jobs. *See id.* Further, Defendant maintains that the alleged deceptive acts were fully disclosed and, as a matter of law, cannot be deceptive. *See id.* Defendant contends that Plaintiff cannot prove that either it or the Assignors have been injured by reason of any alleged deceptive act and that the alleged deceptive practice does not have the requisite consumer impact required under GBL § 349. *See id.* Additionally, Defendant asserts Plaintiff has no standing to bring GBL § 349 claims and that Plaintiff is seeking the very same damages it seeks in its first cause of action, and, therefore, are not independent of any loss suffered by the alleged breach of contract. *See id.*

## III. DISCUSSION

**A.   Standard of review**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted).  Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 255, 106 (1986)) (other citations omitted).  Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's statement of material facts; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions.  *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**B.     Motions to strike**

After Plaintiff filed its papers in opposition to summary judgment, Defendant brought three separate motions to strike Plaintiff's opposition papers, which include: (1) motion to strike the declaration of Plaintiff's counsel, Ceclia Cannon, because the declaration included legal arguments, in violation of Fed. R. Civ. P. 56 (c)(4), *see* Dkt. No. 101; (2) motion to strike portions of the declaration of Michael Orso because the declaration contains conclusory statements, legal arguments, hearsay, contradictory testimony, and improper expert testimony in violation of the Federal Rules of Evidence, Federal Rules of Civil Procedure, and Local Rules, *see* Dkt. No. 107; and (3) motion to strike the declaration of Rocco Avellini because the declaration contains new opinions in violation of Fed. R. Civ. P. 37 and contains inadmissible evidence in violation of Fed. R. Civ. P. 56(c)(4), *see* Dkt. No. 99.

> If a party wishes to argue that an asserted material fact is not supported by the evidence, that party may do so in its summary judgment briefing.  Likewise, although 'a motion to strike has sometimes been used to call to courts' attention questions about the admissibility of proffered' evidentiary material, such a motion is best viewed 'as an invitation by the [party] to consider whether the record . . . may properly be relied upon.'  Since such an invitation is readily extended as part of that party's briefing, a separate motion to strike is unnecessary.

8

*Ricci v. Destefano*, No. 3:04 CV 1109, 2006 WL 2666081, *2 (D. Conn. Sept. 15, 2006) (quoting

*Monroe v. Bd. of Ed. of Wolcott*, 65 F.R.D. 641, 645 (D. Conn. Sept. 15, 1975).  The Court will

consider only evidence shown to be admissible at trial.  "Parties should assume that courts will

undertake this obligation faithfully and fully review the proffered evidence of record and draw

appropriate conclusions." *Ricci*, 2006 WL 2666081, at *3.  Therefore, the Court denies

Defendant's motions to strike.

C.      **Relevant regulatory framework**

        Part 216 of the New York State Insurance Department Regulations ("Regulation 64"),

entitled "Unfair Claims Settlement Practices and Claim Cost Control Measures," governs an

insurer's conduct in the automobile repair process, and provides rules for the processing of first

party motor vehicle physical damage claims and third party property damage claims arising under

motor vehicle liability insurance contracts.  *See* 11 N.Y.C.R.R. § 216.0(a).  Section 216.7 sets

forth the "[s]tandards for prompt, fair and equitable settlement of motor vehicle physical damage

claims." 11 N.Y.C.R.R. § 216.7.

        When an individual's car is involved in an accident and the person makes an insurance

claim, the person's insurer may inspect the car.  *See id.* § 216.7(b)(1).  When inspecting the car,

the insurer must negotiate with the insured or the insured's "designated representative," which may

include an automobile repair shop such as Plaintiff.  *See id.*  Negotiations must be conducted in

"good faith," *id.* § 216.7(b)(7), and the insurer must make "a good faith offer of settlement,

sufficient to repair the vehicle to its condition immediately prior to the loss." *Id.* § 216.7(b)(1).

After negotiations, if the parties cannot reach an "agreed price," which is defined as "the amount

agreed to by the insurer and the insured, or their representatives, as the reasonable cost to repair

damages to the motor vehicle resulting from the loss, without considering any deductible or other

deductions," *id.* § 216.7(a)(1), the insurer must furnish the insured with a prescribed notice of rights letter. *Id.* § 216.7(b)(14)(i).  This notice of rights letter indicates the insurer's offer, and provides that, upon the insured's request, the insurer can recommend a repair shop that will make the repairs at a cost equal to the insurer's estimate. *See id.*; 11 N.Y.C.R.R. § 216.12.  The notice of rights letter further states that, if such request has not already been made, the insured must sign an attached disclosure statement in order to enable the insurer to recommend a repair shop. *See id.* § 216.12.  Further, the disclosure statement advises the insured that, pursuant to New York State Insurance Law § 2610, the insurer cannot require that the repairs be made at a particular shop.

On July 16, 2008, the Superintendent of Insurance issued an opinion letter construing what constitutes "good faith negotiation" under Regulation 64.  Specifically, the opinion letter provides that "a good faith negotiation need not result in an ultimate agreement on a settlement amount provided that a repair shop, reasonably convenient to the claimant, is able to repair the vehicle for the amount the insurer offers in settlement." Ops. Gen. Counsel N.Y.S. Ins. Dept. No. 08-07-09 (July 16, 2008), *available at* http://www.dfs.ny.gov/insurance/ogco2008/rg080709.htm.  This July 16, 2008 opinion letter also refers to an April 16, 2002 opinion letter which indicates that, "if an insurer makes a good faith offer to the insured to pay for the cost of repair and identifies a facility that will repair the damage at the cost estimated by the insurer, the insurer is not obligated to pay for any repair cost that exceeds the amount of the good faith offer required pursuant to 11 NYCRR § 216.7(b)(1)." *Id.* (citation omitted).  Moreover, the letter opines that, "[i]n such a circumstance, if the insured elects to repair the vehicle at another facility at a higher repair cost, the insurer is not financially responsible for the excess cost above the amount of the insurer's offer." *Id.* (citation omitted).  A December 31, 2008 opinion letter further states that "there is no

requirement that either side move off its respective initial position in a negotiation, and an insurer is not required to alter its initial negotiating position on labor rates, or any other negotiable issue, provided that its position is taken in good faith." Ops. Gen. Counsel N.Y.S. Ins. Dept. No. 08-12-09 (Dec. 31, 2008), *available at* http://www.dfs.ny.gov/ insurance/ogco2008/rg081209.htm.

**D.    Breach of contract**

In its motion for summary judgment, Defendant argues that Plaintiff's breach of contract cause of action must be dismissed because the First-Party Assignors suffered no damages.  *See* Dkt. No. 73 at 10.  The First-Party Assignors' vehicles were restored to the pre-loss condition, according to Defendant.  *See id.*  Further, Defendant contends that Plaintiff's breach of contract cause of action must be dismissed because Defendant fulfilled its contractual obligations to the First-Party Assignors.  *See* Dkt. No. 73.  Specifically, Defendant argues that its process for determining the labor rate is reasonable, it is not contractually obligated to pay for overhead expenses or original equipment manufacturer parts, its paint and material costs are determined by estimating software, and Plaintiff has provided no evidence of labor hour deficiencies.  *See id.;* Dkt. No. 103.

Under New York law, a plaintiff alleging a breach of contract claim must establish the following elements: (i) the existence of a contract; (ii) adequate performance of the contract by the plaintiff; (iii) breach by the other party;  and (iv) damages suffered as a result of the breach.  *See Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996) (citation omitted); *see also Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 357-58 (S.D.N.Y. 2001) (citation omitted).  "When the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving practical interpretation to the language employed and the parties' reasonable expectations." *131 Heartland Blvd. Corp. v. C.J. Jon Corp.*, 82 A.D.3d 1188,

1189 (2d Dept. 2011) (citations omitted).  Further, in the context of insurance contracts, the "[a]pplicable provisions of the Insurance Law are 'deemed to [be] part of [an] insurance contract as though written into it.'"  *Trizzano v. Allstate Ins. Co.*, 7 A.D.3d 783, 785 (2d Dept. 2004) (quotation and other citations omitted).

       In response to the motion, Plaintiff contends that Defendant was contractually obligated to pay the amount reasonably necessary to return the First-Party Assignors' vehicles to pre-loss condition, and the fact that the vehicles were returned to their pre-loss condition is not evidence that Defendant paid the contract amount.  *See* Dkt. No. 89 at 6.  First, the Court agrees with Plaintiff.  Simply because Plaintiff did not seek to collect any amount from its customers over what Defendant paid, does not require dismissal of this claim.  Defendant was required to pay the amount required to return the vehicle to pre-loss condition, regardless of whether any repairs were made.  *See* Dkt. No. 87-9  Whether the contract was breached hinges on whether the amount paid to Plaintiff was sufficient to satisfy this requirement.  As the assignee, Plaintiff stands in the shoes of the First-Party Assignors and has the same rights as the insureds under the policies.  *See Citibank N.A. v. Tele/Resources, Inc.*, 724 F.2d 266, 269 (2d Cir. 1983) (citations omitted).  Since the First-Party Assignors could have pursued this action but for the assignment to Plaintiff, it is without question that Plaintiff, as the assignee, can now pursue this claim.  These findings notwithstanding, the Court finds that Defendant's motion for summary judgment must be granted.

       The relevant language of the insurance policy states

> LIMITS OF LIABILITY
> 1.    The limit of liability for loss to a covered auto, non-owned auto, or custom parts or equipment is the lowest of:
>       * * *
>       c.    the amount necessary to repair the damaged property to its pre-loss condition reduced by the applicable deductible;

* * *

2. Payments for loss to a covered auto, non-owned auto, or custom parts or equipment are subject to the following provisions:

* * *

 d. In determining the amount necessary to repair damaged property to its pre-loss condition, the amount to be paid by us:

  (i) will not exceed the prevailing competitive labor rates charged in the area where the property is to be repaired and the cost of repair or replacement parts and equipment, as reasonable determined by us; and

  (ii) will be based on the cost of repair or replacement parts and equipment which may be new, reconditioned, remanufactuered, or used, including, but not limited to:

   (a) original manufacturer part or equipment; and

   (b) nonoriginal manufacturer parts or equipment.

Dkt. No. 87-9 at 37-38; *see also* Dkt. No. 88 at ¶ 11.

Plaintiff contends that there are five categories of deficiencies where Defendant breach the above policy.[3]  Plaintiff claims that there was a deficiency in the labor rate, a deficiency in the labor hours, a refusal to pay for original equipment manufacturer ("OEM") parts versus non-original equipment manufacturer ("non-OEM") parts, a refusal to negotiate on the cost of paint

---

[3] Plaintiff names four categories of deficiencies that breach the insurance policy in their amended complaint, which include a deficiency in the labor hours, deficiency in the labor rate, use of non-original equipment manufacturer ("non-OEM") parts in their estimates, and refusal to negotiate on the listed paint material.  *See* Dkt. No. 35.  However, in Plaintiff's memorandum of law, Plaintiff identifies four categories of deficiency, which again included deficiency in labor rates, use of non-OEM parts, and paint material – but added overhead costs and omitted the category for deficiency in labor hours.  *See* Dkt. No. 89 at 7-12.  In Plaintiff's supporting papers, Michael Orso summarily identifies all of the categories for deficiencies in his declaration.  *See* Dkt. No. 86 at ¶ 80.

material, and a refusal to pay for operating costs such as waste disposal, subscription data services, and administrative costs.  *See* Dkt. Nos. 35; 89 at 7-12; 86 at ¶ 80.

Defendant maintains that the labor rate that it paid to First-Party Assignors in the repair of their vehicles was in compliance with its contractual obligations under the policy.  *See* Dkt. No. 73.  The policy states that Defendant's labor rate will not exceed the prevailing competitive labor rates charged in the area where the vehicle will be repaired, as reasonably determined by Defendant.  *See* Dkt. No. 87-9.  Defendants submit the Labor Rate Reference Guide used by Defendant to establish prevailing labor rates.  *See* Dkt. No. 87-4.  This guide states that the labor rate used in Defendant's estimates are based upon the prevailing labor and material rates in a geographic area, and the marketplace determines the prevailing rate based upon Defendant's ability to reach agreed prices with repair facilities.  *See id.*  If Defendant finds that it is unable to reach agreed labor rates on a regular basis, then Defendant will initiate a review the rates using this guideline.  *See id.*.

Louis John DeLuca, Defendant's claim's process director, testified that he participated in creating and executing the Labor Rate Reference Guide in 2008, and this guide is used nationwide by Defendant.  *See* Dkt. No. 87-3 at 31-35, 89-90.  Mr. DeLuca affirmed that labor and material rates are monitored by Defendant through its estimates and reaching agreed prices.  *See id.* at 92, 95.  The guide directs that Defendant obtain market research, which includes redacted estimates from the area repair facilities.  *See id.* at 161.  The market rates are then verified with the use of subrogation claims submitted to Defendant from other insurance companies and industry data, among other sources.  *See id.* at 136, 139, 170; Dkt. No. 72-14.  Industry data includes Defendant's quarterly report of labor rates paid by Defendants.  *See* Dkt. No. 87-3 at 47, 139. After this data is assembled, a request for rate change report is prepared and submitted to Mr.

DeLuca for review.  *See id.* at 64; *See* Dkt. No. 74-14.  Mr. DeLuca received one request for a rate

change that was approved in 2010.  *See* Dkt. No. 87-3 at 64; Dkt. No. 87-8.

      Michael Beney, the New York State property damage processor for Defendant, testified

that Defendant interprets the prevailing rates in the area with the use of the Labor Rate Reference

Guide.  *See* Dkt. No. 87-8 at 13-14.  Mr. Beney is contacted by a supervisor or a manager and

advised that they are having difficulty getting agreed labor rates, and then Mr. Beney advises them

to use the Labor Rate Reference Guide.  *See id.* at 15.  After the data is acquired, the manager and

Mr. Beney will review the collected data and submit it to Mr. DeLuca.  *See id.* at 19; *See* Dkt. No.

87-3 at 55.  In 2010, this process lead to an increase in the labor rate for body work and

refinishing work from forty-four dollars to forty-six dollars.  *See* Dkt. No. 87-8 at 30.

      In opposition, Plaintiff submits the expert report and declaration of Fred Jennings.  *See*

Dkt. No. 84-2.  The Court agrees with Defendant that Dr. Jennings' "expert" report actually

supports Defendant's position.  *See id*.  In a survey of 173 repair shops in Onondaga County

requested by Plaintiff's counsel, it was determined that, "[o]f those shops that have separate rates,

the posted or most typical hourly late rate for body work is $51.77; for painting is $52.30; for

framing is $62.47; for refinishing is $50.71; and for sheet metal work is $52.17."  *Id.* at 29, 31.

During the time period at issue, Defendant was offering $44 to $46 per hour, while Plaintiff was

seeking between $68 and $75 per hour.  The evidence in the record establishes that Defendant's

labor rate was reasonably calculated and within the prevailing market rate at all relevant times.

Plaintiff does not cite to any further admissible evidence that raises a material question of fact that

Defendant's labor rate paid on the First-Party Assignors was a breach of contract.  The Court

dismisses the breach of contract allegations that relate to a deficiency in labor rate paid by

Defendant.

While Plaintiff alleges that the use of non-OEM parts in Defendant's estimates for the repair of First-Party Assignor's vehicles was a breach of contract, Defendant argues that the use of non-OEM parts is specifically permitted within the insurance policy and by Regulation 64. *See* Dkt. No. 89-9. The insurance policy specifically provides that when determining the amount necessary to repair the damaged property to the pre-loss condition, the amount paid by defendant will be based upon the use of both OEM and non-OEM parts. *See* Dkt. No. 87-9 at 38. In opposition, Plaintiff submits the declaration of Mr. Orso. *See* Dkt. No. 86. Mr. Orso explains that Plaintiff prefers to use OEM parts in most cases. *See id.* at 30. Mr. Orso directs the Court to a few notices of deficiency for First-Party Assignors' claims where Defendant allegedly would not pay for the full price of the OEM parts. *See id.* at ¶¶ 31-40. He does not offer evidence of how each specific claim required an OEM part pursuant to the policy. *See id.* at ¶¶ 31-40. Instead, Mr. Orso states that the use of non-OEM parts "is the kind of detail that some customers who have collision repair done don't care about, but my customers do notice and do care." *See id.* at ¶ 33. Mr. Orso addresses First-Party Assignor Christy claim by summarily concluding that the non-OEM hood didn't equal the OEM part. *See id.* at ¶ 36. Likewise, Mr. Orso also discusses that there were "problems" with the right non-OEM fog lamp bulb, but he does not provide any evidence for the "problems" at issue. *See id.*

Mr. Orso demonstrates that he has a clear bias against the use of non-OEM parts in his business, as he describes their use as the aftermarket "merry-go-round." *See id*. at ¶ 38. Mr. Orso explains that his customers are "people who care about their cars," and "they would only accept a new OEM part to put the vehicle back in pre-accident condition." *See id.* at ¶ 40. The Court finds that although Plaintiff, through the declaration of Mr. Orso, identifies claims written with non-OEM parts, he has failed to provide any evidence that Defendant breach the insurance policy

terms.  He has only established that his business and his customers do not accept non-OEM parts.

However, Plaintiff's refusal to accept non-OEM parts in the repair of vehicles does not raise any

material questions of facts that Defendant's payment for non-OEM parts was a breach of contract.

*See Patchen v. Gov't Emp'rs Ins. Co.*, 759 F. Supp. 2d 241, 245 (E.D.N.Y. 2011) (dismissing

breach of contract claim that was based only on the plaintiff's assertion that no non-OEM parts are

equal or better to OEM parts).  Accordingly, the Court dismisses Plaintiff's breach of contract

claim that relates to the non-payment for OEM parts.

Plaintiff also claims that Defendant did not negotiate on its estimates for the use of paint

materials.  *See* Dkt. No. 35.  Defendant states that it uses software to estimate the cost of the paint

materials needed for each vehicle repair.  *See* Dkt. No. 88 at ¶ 23.  Plaintiff's only argument is that

it also uses a different software to estimate the number of refinishing hours of a job.  *See id.*  The

insurance policy specifically states that Defendant will calculate the cost to repair property to the

pre-loss condition based upon cost of repair as determined by Defendant.  *See* Dkt. No. 87-9 at 38.

Plaintiff does not argue that Defendant's software did not reasonably calculate the paint material

cost, Plaintiff argues that Defendant had a contractual obligation to negotiate its cost estimate.

*See* Dkt. No. 88 at ¶ 23.  The Court finds that the plain language of the policy requires that

Defendant "reasonably" determine the cost of repair, and Plaintiff has not raised a material

question of fact that Defendant did not reasonably determine the paint material costs.

Accordingly, the Court dismisses Plaintiff's breach of contract claims that relate to the cost of

paint materials.

Defendant contends that overhead and operational charges are not covered by the

insurance policy.  *See* Dkt. No. 89 at 9.  There is no policy provision that obligates Defendant to

pay for Plaintiff's overhead costs or operating expenses.  *See* Dkt. No. 87-9.  In opposition, Mr.

Orso submits a declaration stating the reasons why overhead and operating expenses should be included in the cost of repairing a vehicle to its pre-loss condition, but does not cite to admissible evidence or raise a material question of fact that Defendant was contractually obligated to pay for these costs.  Mr. Orso stated that the subscription database service is a necessary part of repairing the First-Party Assignors' vehicles because it contains technical details from the manufacturer. *See* Dkt. No. 86 at ¶¶ 11-23.  The Court finds that any special knowledge needed to repair a certain manufacturer's vehicle is a cost of doing business and properly placed with the repair shop. *See Randolph v. Liberty Mut. Ins. Co.*, 16 Misc. 3d 1131(A), *2 (N.Y. Dist. Ct. 2007)

Mr. Orso also relies upon the First-Party Assignors' signed "authorization and guidelines to repair form" that provides that the First-Party Assignors agreed to pay the overhead and operating costs.  *See* Dkt. No. 86 at ¶ 10.  The fact that the First-Party Assignors separately agreed to pay Plaintiff for these expenses does not have any bearing on whether Defendant's insurance contract obligated payment for these items.

Plaintiff claims that hazardous waste disposal is contemplated by Regulation 64 and, therefore an appropriate line item cost in restoring a vehicle to its pre-loss condition.  *See* Dkt. No. 89 at 7.  Mr. Orso cites to five First-Party Assignors as examples that waste charges vary, but he does not identify any material question of fact that there was a breach of contract on any of the forty claims related to waste disposal.  *See* Dkt. No. 86 at ¶ 80.  In any event, the Court's review of Defendant's Estimates for those five identified assignors, where hazardous waste disposal fees were alleged to be not paid, reveals that Defendant paid a hazardous waste disposal fee as a line item cost for each assignor's vehicles.  *See* Dkt. Nos. 87-10 at PROG000442, PROG001726, PROG002546, PROG003263; 102 at PROG00822.  The Court dismisses Plaintiff's breach of contract claims that relate to operating costs and overhead expenses.

Finally, Defendant argues that Plaintiff has not submitted any evidence that there is a deficiency in the labor hours.  *See* Dkt. No. 73.  The Court agrees with Defendant that Plaintiff has not provided or pointed to any evidence in the record to support that there was a deficiency in labor hours not paid for by Defendant.  Those claims cited to in the record by Mr. Orso indicate that there was a deficiency in the labor rate, but not the number of labor hours.  Although Plaintiff has submitted hundreds of pages of documents allegedly identifying deficiencies, Plaintiff has made no attempt to explain these documents or why the alleged deficiencies identified therein were necessary to return the vehicles to their pre-accident conditions.  *See, e.g.,* Dkt. Nos. 86-5, 86-6, 86-7, 86-8.  Based on the foregoing, the Court grants Defendant's motion for summary judgment as to Plaintiff's breach of contract claim.

**E.    General Business Law § 349**

Defendant asserts that Plaintiff's GBL § 349 claim must be dismissed for multiple reasons. *See* Dkt. No. 73 at 14-26.  Specifically, Defendant contends as follows: (1) Defendant's business practices are not deceptive; (2) Plaintiff cannot show the requisite injury; (3) the alleged deceptive practice does not have the required consumer impact; and (4) Plaintiff does not have standing to bring these claims on behalf of the Assignors.  *See id.*

General Business Law § 349 declares unlawful all "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."  N.Y. Gen. Bus. Law § 349(a).  "'Section 349 governs consumer-oriented conduct and, on its face, applies to virtually all economic activity.'"  *North State Autobahn, Inc. v. Progressive Ins. Group Co.*, 102 A.D.3d 5, 953 N.Y.S.2d 96, 100 (2d Dep't 2012) (quoting *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 55, 698 N.Y.S.2d 615, 720 N.E.2d 892 (1999)) (other citations omitted).

To successfully assert a claim under General Business Law § 349(h), "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *City of New York v. Smokes–Spirits.Com, Inc.*, 12 N.Y.3d 616, 621 (2009); *see also Cohen v. JP Morgan Chase & Co.*, 489 F.3d 111, 126 (2d Cir. 2007) (citation omitted).

### 1. Consumer or widespread public injury

Defendant contends that this claim should be dismissed because Plaintiff has failed to allege any consumer harm, let alone the 'widespread' public injury required to state a claim under GBL § 349. *See* Dkt. No. 73 at 22-24. Further, Defendant asserts that, because Plaintiff is a third-party business rather than a consumer, its injuries are easily distinguished from consumer harm and do not implicate the public interest. *See id.* Defendant claims that this case involves a private contractual dispute between Defendant and an automobile repair shop over the rates charged by Plaintiff and the coverage afforded under Defendant's policy; and, therefore, does not satisfy the consumer-oriented prong of section 349. *See id.*

"[P]arties claiming the benefit of [General Business Law § 349(h) ] must, at the threshold, charge conduct that is consumer oriented." *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 320 (1995) (citation omitted); *see also Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 334 (1999) (citation omitted); *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25 (1995). "Private contract disputes, unique to the parties . . . [do] not fall within the ambit of the statute." *Oswego Laborers' Local 214 Pension Fund*, 85 N.Y.2d at 25 (citation omitted); *see also New York Univ.*, 87 N.Y.2d at 320. A "'single shot transaction,'" *Genesco Entertainment, Div. of Lymutt Indus., Inc. v. Koch*, 593 F. Supp. 743, 752 (S.D.N.Y. 1984), which is "tailored to meet the purchaser's wishes and requirements," does not, without

20

more, constitute consumer-oriented conduct for the purposes of this statute.  *See New York Univ.*,

87 N.Y.2d at 321; *see also Biancone v. Bossi*, 24 A.D.3d 582, 583 (2d Dep't 2005) (citations

omitted).

> On the other hand, conduct has been held to be sufficiently
> consumer-oriented to satisfy the statute where it involved "an
> extensive marketing scheme" . . . , where it involved the
> "multi-media dissemination of information to the public" . . . , and
> where it constituted a standard or routine practice that was
> "consumer-oriented in the sense that [it] potentially affect[ed]
> similarly situated consumers."

*North State Autobahn, Inc. v. Progressive Ins. Group Co.*, 102 A.D.3d 5 (2d Dep't 2012) (internal

and other quotations omitted).  "Simply put, '[the] defendant's acts or practices must have a broad

impact on consumers at large.'"  *Id.* (quotation and other citations omitted).

      The conduct alleged by Plaintiff in this case relates to thirty-two policyholders who either

are or were Plaintiff's customers, and all of whom are subject to Defendant's standard form

insurance policy.  Therefore, this dispute is not "limited to a challenge regarding coverage made

on the basis of facts unique to [a single insured], but relate to consumer-oriented conduct affecting

the public at large."  *Shebar v. Metro. Life Ins.*, 25 A.D.3d 858, 859 (3d Dep't 2006) (citations

omitted).  Where, as here, a defendant enters into "contractual relationship[s] with customers

nationwide" *via* a form contract and has allegedly committed the challenged actions in its dealings

with multiple insureds, courts have held that such behavior affects the public generally and,

therefore, satisfies the requirement of "consumer-oriented" conduct within the meaning of Section

349.  *M.V.B. Collision, Inc. v. Allstate Ins. Co.*, 728 F. Supp. 2d 205, 222 (E.D.N.Y. 2010); *see,*

*e.g., Riordan v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d 47, 51-53 (2d Cir. 1992) (holding that

section 349 was applicable to insurers where the plaintiffs demonstrated that similar practices had

been employed by the defendant against multiple insureds); *Joannou v. Blue Ridge Ins. Co.*, 289

A.D.2d 531, 531 (2d Dep't 2001) (holding that "[a]n insurance carrier's failure to pay benefits allegedly due its insured under the terms of a standard insurance policy can constitute a violation of General Business Law § 349") (citations omitted).

Based on the foregoing, the Court declines to dismiss Plaintiff's section 349 claim pursuant to the consumer-oriented prong of the statute.

### 2. Deceptive or misleading practice

The New York Court of Appeals has held that, under Section 349, "[w]hether a representation or an omission, the deceptive practice must be 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'" *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29 (2000) (quotation and other citations omitted). A deceptive practice, however, "need not reach the level of common-law fraud to be actionable under section 349, "and reliance is not an element of a section 349 claim. *See id.* (citations omitted). "The plaintiff, however, must show that the defendant's 'material deceptive act' caused the injury." *Id.* (quotation omitted). "[T]he term 'deceptive practice' in Section 349 is interpreted to mean acts which are dishonest or misleading in a material respect". *Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250 (S.D.N.Y. 1995) (citing *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26 (1995). In an attempt to avoid "a tidal wave of litigation against businesses that was not intended by the Legislature," the New York Court of Appeals adopted an objective definition of deceptive acts and practices, and this objective test "may be determined as a matter of law or fact (as individual cases require)." *Oswego*, 85 N.Y.2d at 26 (noting that GBL § 349 is modeled after the Federal Trade Commission's anti-fraud provision (15 U.S.C. § 45).

In its amended complaint, Plaintiff alleges that, with respect to each of the thirty-two Assignors, "Defendants' limitation of costs was a material deceptive action because it knew when

it made its limitation that it was not providing the full amount necessary to restore the Vehicles to their pre-Accident condition." *See* Dkt. No. 35 at ¶ 49.  Further, Plaintiff claims that Defendant engaged in unfair claims practices, which include the inappropriate methods of determining its labor rate, negotiating in bad faith, and the misrepresentation that another repair shop was available to repair the vehicle to its pre-accident condition for the amount in the Defendant's estimate. *See id.* at ¶ 47; Dkt. No. 89 at 12-16.

Defendant contends that there was no evidence that it falsely represented to Assignors that there was another repair shop available to restore the vehicles to their pre-accident condition. *See* Dkt. No. 73 at 14, n.6.  Although it was alleged in the complaint, Plaintiff does not direct the Court to, and the Court does not find, any evidence in the record that sustains this alleged practice. Accordingly, the Court finds that this contention is without any basis.  The remaining crux of Plaintiff's GBL § 349 claim is that Defendant engaged in "[t]he policy and practice of writing estimates to a lower standard while pretending to be meeting the pre-loss condition standard." *See* Dkt. No. 89 at 12.

Defendant contends that its practice in handling insurance claims is not deceptive, and it further argues that its practices were fully disclosed to the Assignors.  Defendant, through a manager repair representative ("MMR"), conducts an inspection of the Assignors' vehicles and drafts an estimate of cost to repair their vehicles to pre-accident condition. *See* Dkt. No. 88 at ¶ 20.  Defendant uses industry-accepted, estimating software for writing collision repairs estimates and determining repair costs. *See id.* at ¶ 23; Dkt. No. 87-7 at 42, 76-77, 80-81, 114, 103, 107. Defendant determines the prevailing labor rate in a geographic area through the use of its "Labor Rate Reference Guide." *See id.* at 28.  The Labor Rate Reference Guide provides a process when reviewing rates to determine if they are out-of-line with prevailing market rates. *See* Dkt. No. 87-

4.  To show that these rate reviews occur, Defendant submitted a labor rate increase request dated September 30, 2010.  *See* Dkt. No. 74-14.  The insurance policy states that repair costs will be based upon replacement parts and equipment which may be new, reconditioned, re-manufactured, or used including non-original manufacturer parts or equipment.  *See* Dkt. No. 87-9.  The estimates of the costs of repairs were communicated in a strait forward and clear manner on the calculation and the amount Defendant estimated to be the cost of repairing the vehicles to their pre-loss condition.  *See* Dkt. Nos. 87-10; 102-1.

Plaintiff relies heavily upon Mr. Orso's declaration to raise material questions of fact.  *See* Dkt. No. 89 at 12-17.  Plaintiff's president, Michael Orso, provides an outline of the exchange of estimates with Defendant during the repair of a vehicle.  *See* Dkt. No. 86 at ¶¶ 77-78.  In general, Plaintiff and Defendant write an initial estimate and then Plaintiff compares the two.  *See id.* Thereafter, Plaintiff prepares a Notice of Deficiency with an attached list of items that Defedant did not include in their estimate but Plaintiff had its estimate.  *See id.*  Mr. Orso states that sometimes Plaintiff comes back with a supplemental estimate, which allows for the outstanding items.  *See id.*  If additional damages are discovered during the repair, an additional deficiency notice is prepared and sent to Defendant, and Defendant may also respond with an additional supplement estimate.  *See id.*  This process, according to Mr. Orso, will repeat as often as necessary until they reach an agreed price or Defendant refuses to pay any additional requested amounts.  *See id.*  The Assignors' claims in this action did not reach an agreed price.  *See id.*

This process is also recited by Larry Zaleppa, who writes estimates and assists in management of Plaintiff.  *See* Dkt. No. 83 at ¶¶ 14-15.  Mr. Zaleppa does not state that Defendant's employees engaged in dishonest or misleading activity.  *See id.* at ¶¶ 1-21.  Mr. Orso explained that "there are many complicated factors that go into [returning a vehicle to its pre-

accident condition], and many of the ways which a vehicle might not be returned to pre-accident condition are not immediately apparent just from looking at the vehicle." *See id*. at ¶ 81.

Resolving all inferences in favor of Plaintiff, the Court does not find a material question of fact that Defendant engages in deceptive or misleading practices in providing estimates to repair the damaged vehicles. Plaintiff does not direct the Court to any admissible evidence in the record that indicates that Defendants were engaging in dishonest activity. To the contrary, Plaintiff's president sets forth a good faith process that Defendant and Plaintiff engage in for exchanging estimates and supplementing those estimates. Mr. Orso extensively sets forth his opinion that Plaintiff and Defendant approach the repair of vehicles from significantly different places including the use of parts, rates of labor, and ancillary charges. *See id.* at ¶¶ 1-88. However, Mr. Orso does not assert that Defendant acted with dishonesty during general business dealings, and Mr. Orso does not claim any specific acts of dishonesty related to any of the thirty-two Assignors' repaired vehicles. *See id.* Mr. Zaleppa testified that he could not recall any specific instances of unethical behavior by Defendant's employees. *See* Dkt. No 88 at ¶ 52. Accordingly, the Court grants Defendant's motion for summary judgment dismissing Plaintiff's GBL § 349 cause of action.

### 3. N.Y. Insurance Law § 2601

"Section 2601 prohibits insurers from engaging 'in unfair claim settlement practices' by, for example, 'knowingly misrepresenting to claimants pertinent facts or policy provisions relating to coverages at issue.' N.Y. Ins. Law § 2601. Courts have held that a private right of action is not available under either statute." *M.V.B. Collision, Inc. v. Allstate Ins. Co.*, 728 F. Supp. 2d 205, 219 (E.D.N.Y. 2010) (citations omitted). The Second Circuit has held that "[p]laintiffs cannot circumvent" the lack of a private right of action under a statute "by claiming [that a violation of

the statute] is actionable under § 349."  *Conboy v. AT & T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001).

In *M.V.B.*, the plaintiff alleged that the defendant had engaged in a retaliatory scheme to dissuade the defendant's insureds from patronizing the plaintiff.  *See M.V.B. Collision*, 728 F. Supp. 2d at 219-20.  "The alleged scheme involved not only 'unfair settlement practices' and steering but also, *inter alia*, alleged retaliatory totaling of vehicles, defamatory comments, and threats that insureds would 'wind up in civil remedies if they took their car to Mid Island Collision.'" *Id.*  Based on these facts, the court found that the "scheme extended beyond steering, beyond settlement practices, and, accordingly, beyond § 2601 and § 2610." *Id.* at 220 (citation omitted).

In the present matter, unlike the situation in *M.V.B. Collision*, Plaintiff's GBL § 349 claim does not allege any conduct beyond the alleged unfair estimate practices.  Specifically, the amended complaint alleges that "Defendant frequently provide[s] a lower estimate of the cost of repairs than that which is actually required to repair a given vehicle to its pre-loss condition." Dkt. No. 35 at ¶ 47.  Plaintiff argues that this conduct was "a material deceptive action because it knew when it made its limitation that it was not providing the full amount necessary to restore the Vehicles to their pre-Accident condition." *Id.*  Finally, Plaintiff asserts that "Defendant['s] failure to negotiate all elements of the specified claim as required by regulation constitutes a deceptive business practice within the meaning of General Business Law § 349." *Id.* at ¶ 34.

Unlike *M.V.B.*, Plaintiff has not alleged or submitted any evidence beyond the alleged unfair estimate practices.  Although *M.V.B.* makes clear that, in certain situations, a plaintiff may be able to set forth a free-standing GBL § 349 claim, the present matter is clearly not such a case. *See Joannou v. Blue Ridge Ins. Co.*, 289 A.D.2d 531, 532 (2d Dep't 2001) (holding that "[a]n

insurance carrier's failure to pay benefits allegedly due its insured under the terms of a standard insurance policy can constitute a violation of General Business Law § 349") (citations omitted).

As such, in the alternative, the Court finds that Plaintiff's GBL § 349 claim is precluded by N.Y. Insurance Law § 2601.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion for summary judgment is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 31, 2015
      Albany, New York

Mae A. D'Agostino
U.S. District Judge

27