# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| NICK'S GARAGE, INC., | ) | |
| | ) | Civil Action No. |
| | ) | 5:12-cv-00777-MAD-DEP |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| PROGRESSIVE CASUALTY INSURANCE COMPANY; NATIONAL CONTINENTAL INSURANCE COMPANY; PROGRESSIVE ADVANCED INSURANCE COMPANY; PROGRESSIVE DIRECT INSURANCE COMPANY; PROGRESSIVE MAX INSURANCE COMPANY; PROGRESSIVE NORTHERN INSURANCE COMPANY PROGRESSIVE PREFERRED INSURANCE COMPANY; and PROGRESSIVE SPECIALTY INSURANCE COMPANY, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

---

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE THE EXPERT REPORT AND PROPOSED TESTIMONY OF FREDERIC B. JENNINGS JR., PH.D.**

---

Michael R. Nelson (Bar No.: 517554)
Kymberly Kochis (Bar No.: 517536)
Francis X. Nolan, IV (Bar No.: 517952)
**Eversheds Sutherland (US) LLP**
The Grace Building, 40th Floor
1114 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 389-5000
Facsimile:  (212) 389-5099

*Attorneys for Defendants*

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................................ii

TABLE OF AUTHORITIES ..........................................................................................................iii

    I.   PRELIMINARY STATEMENT. ....................................................................................1

    II.  THE JENNINGS REPORT AND OPINION. .................................................................1

    III. THE STANDARD FOR ADMISSIBILITY OF EXPERT OPINIONS. ..........................2

    IV. DR. JENNINGS' OPINIONS DO NOT FIT PLAINTIFF'S CLAIMS. ...........................3

    V.  DR. JENNINGS' REPORT IS UNRELIABLE................................................................5

        A.  Dr. Jennings' Report Does Not Meet Any Of The Daubert Factors. ............................5

        B.  The Report Is Speculative, Unsupported By Facts, And Relies On False Assumptions. .................................................................................................................8

            i.   The Abacus Survey is inherently flawed. ..............................................................8

            ii.  The Report assumes that Progressive unlawfully suppressed auto body labor rates. ........................................................................................................................9

            iii. The Report assumes that auto body repair labor rates would equal mechanical rates in a "free and uncontrolled marketplace." ..................................................10

            iv. The Report assumes that the rates paid by Progressive are routinely lower than mechanical rates. .................................................................................................11

            v.  The Report assumes that Plaintiff would charge the same benchmark rate "but for" the influence of insurers. ....................................................................11

        C.  Jennings' Application Of IRS Tax Methodology Governing International, Transborder, *Intra*company Transfers Is Inherently Unreliable. ................................12

    VI. DR. JENNINGS TESTIFIED FALSELY. .......................................................................13

    VII. CONCLUSION..............................................................................................................15

CERTIFICATE OF SERVICE .......................................................................................................16

# **TABLE OF AUTHORITIES**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002) ............................... 5, 8, 9

*Bourjaily v. United States*, 483 U.S. 171 (1987) ............................................................................. 3

*Comm'r v. First Sec. Bank of Utah, N.A.*, 405 U.S. 394, 400 (1972) ............................................ 12

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) ................................................... passim

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) .............................................................................. 12

*In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396 (S.D.N.Y. 2016) ............................... 11

*In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004) ......................................... 3

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ............................................................. 2, 3, 8

*Meineker v. Hoyts Cinemas Corp.*, 154 F. Supp. 2d 376 (N.D.N.Y. 2001) .................................... 7

*Royal Ins. Co. of Am. v. Joseph Daniel Constr., Inc.*, 208 F. Supp. 2d 423 (S.D.N.Y. 2002) ......... 3

*U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122 (S.D.N.Y. 2015) ......... 8

**Statutes**

42 U.S.C. § 482 .............................................................................................................................. 12

**Rules**

Federal Rules of Evidence 104 ....................................................................................................... 3

Federal Rules of Evidence 702 ................................................................................................ 2, 3, 8

**Regulations**

26 C.F.R. § 1.482-1 ................................................................................................................ 12, 13

26 C.F.R. § 1.482-9 ....................................................................................................................... 13

**I.      PRELIMINARY STATEMENT.**

Plaintiffs' proposed damages expert, Frederic B. Jennings Jr., Ph.D., issued a Report dated January 13, 2014. *See* Jennings' Expert Report (Jan. 13, 2014) ("Jennings Report"), ECF No. 84-2. Dr. Jennings' Report and opinion testimony (collectively, the "Report") do not fit Plaintiff's claims, are not supported by reliable methodology or data, and are undermined by Dr. Jennings' history of untruthful statements on the record. Accordingly, Progressive respectfully moves this Court to preclude the use of the Report at trial.

**II.     THE JENNINGS REPORT AND OPINION.**

Dr. Jennings has made a career of appearing as an "expert" for auto body repair shops embroiled in litigation with insurance companies. Jennings has, without exception, taken the position that the presence of auto insurers in the damage appraisal and payment process is unlawful. In his Report, Dr. Jennings theorizes that Plaintiff is the victim of illegal labor rate suppression carried out by the *entire auto insurance industry*. Jennings argues that "but for" the presence of all auto insurers in the damage appraisal and payment process, Plaintiff would be able to charge a labor rate equal to or more than the average auto body mechanical repair labor rate in Onondaga County, New York. The mechanical labor rate used by Dr. Jennings as his benchmark "comparable uncontrolled price" is nearly double the local prevailing auto body labor rate Progressive paid to Plaintiff. By choosing a benchmark rate that is nearly double the prevailing auto body rates paid by Progressive, Dr. Jennings concludes that Plaintiff suffered "economic losses . . . due to actions of" Progressive. Jennings Report at 1, ECF No. 84-2. Dr. Jennings' Report does not fit the allegations or facts in this case. Plaintiff does not seek payment of labor rates at the levels set forth in Dr. Jennings' Report. Rather, Plaintiff claims entitlement to its posted auto body labor rates, which are well below the benchmark mechanical labor rate advocated by Dr. Jennings.

1

In addition to being irrelevant to Plaintiff's claims and the facts in this case, Dr. Jennings' Report is so deeply flawed that neither this Court nor a jury can or should rely on it. The Report is based on a flawed and unverified survey of Onondaga, New York area mechanical repair rates conducted by Abacus Associates, another of Plaintiff's proffered experts. *See* Report by Abacus Assocs. (Sept. 2013) ("Abacus Report"), attached to Jennings Report as Ex. 3, ECF No. 84-2. The Abacus survey is rife with errors and other flaws that render Dr. Jennings' opinions unreliable. Dr. Jennings' opinions are also unsupported by sound methodology as required by Evidence Rule 702. Dr. Jennings failed to test his methodology or the host of assumptions on which he relied in forming his opinions. Dr. Jennings' repeated reliance on baseless assumptions unsupported by any evidence renders his Report both unreliable and unhelpful to the trier of fact. Further, Dr. Jennings derived his auto body/mechanical comparison methodology from IRS tax regulations governing international, cross-border intracompany transfers of property or services. This tax methodology is not meant for the purpose employed by Dr. Jennings and is unreliable as applied.

Finally, the Court should preclude Dr. Jennings from testifying because he is unreliable and lacks credibility, as evidenced by false statements given during sworn deposition testimony in other matters.

### III. THE STANDARD FOR ADMISSIBILITY OF EXPERT OPINIONS.

Federal Rule of Evidence 702, which reflects the U.S. Supreme Court's rulings in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) ("*Daubert*"), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ("*Kumho*"), requires trial judges to act in a "gatekeeping" role by making a preliminary assessment to determine whether an expert's testimony is both reliable and relevant. *Daubert*, 509 U.S. at 597. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other

> specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

As noted by the Supreme Court, Rule 702 "establishes a standard of evidentiary reliability" and "requires a valid … connection to the pertinent inquiry as a precondition to admissibility." *Kumho*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592).

The proponent of expert testimony must establish both reliability and relevance by a preponderance of the evidence for a court to find it admissible under Fed. R. Evid. 104(a). *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987); *see also Royal Ins. Co. of Am. v. Joseph Daniel Constr., Inc.*, 208 F. Supp. 2d 423, 425 (S.D.N.Y. 2002). This burden is the same regardless of "whether a witness is qualified . . . or evidence is admissible." Fed. R. Evid. 104(a).

**IV.    DR. JENNINGS' OPINIONS DO NOT FIT PLAINTIFF'S CLAIMS.**

An expert's methodology must meet a relevance test that requires a "fit" between the proposed testimony and the issues in the case. *Daubert*, 509 U.S. at 591; *see also In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004) ("This helpfulness requirement is akin to the relevance requirement of Rule 401, which is applicable to all proffered evidence, but … goes beyond mere relevance … because it also requires expert testimony to have a valid connection to the pertinent inquiry.") (quotations and citations omitted). Dr. Jennings' opinions do not "fit" with Plaintiff's claims.

The crux of Dr. Jennings' opinion is that "but for" auto insurers' unlawful "influence over the ACR [auto collision repair] payment process," Plaintiff would at a minimum charge its customers the average prevailing auto mechanical labor rate in the Onondaga area. *See* Jennings Report at 3, ECF No. 84-2; *see also* Dep. Tr. of Frederic B. Jennings (May 9, 2014) ("Jennings

3

Dep.") at 52:8-11, attached to the Declaration of Michael R. Nelson (Feb. 12, 2018) ("Nelson Decl.") as Ex. "A". Dr. Jennings bases his conclusion on an October 2013 survey of posted labor rates of 173 "Collision shops" and "Non-collision shops" that ostensibly provide auto mechanical repair services. Abacus Report, ECF No. 84-2. Dr. Jennings chooses auto mechanical repair rates as his benchmark because he believes that auto insurers have no influence or control over the market for mechanical repairs. Jennings Report at 3, ECF No. 84-2.

Apparently unbeknownst to Dr. Jennings, Plaintiff is not seeking to be paid a mechanical labor rate for auto body collision repairs, let alone a rate approaching the benchmark "uncontrolled price" posited by Dr. Jennings. Rather, Plaintiff seeks to collect its *posted auto body collision repair* labor rates. Am. Compl. (Sept. 23, 2013) ¶ 34, ECF No. 35. Further, Plaintiff's owner testified that rates for mechanical repairs should be higher than rates for auto body repairs. Dep. Tr. of Michael Orso (May 8, 2014) ("Orso Dep.") at 299:20-301:9, Nelson Decl. Ex. "B". That statement is directly at odds with Dr. Jennings' entire theory.

It should therefore come as no surprise that Dr. Jennings' Report bears no relevancy to the specific claims at issue in this case. Dr. Jennings concedes that he never read any deposition transcripts in this case (Jennings Dep. at 82:10-12, Nelson Decl. Ex. "A"), and did not incorporate specific information he received from Plaintiff into his Report. *See, e.g.*, *id.* at 78:5-80:3. Instead, Dr. Jennings generated a nearly identical Report to what he has submitted in unrelated litigations in Mississippi and Ohio. *See* Jennings Expert Report in *Mosley v. Geico Ins. Co.*, Case No. 3:13-cv-00161-LG-JCG (S.D. Miss.) (Mar. 23, 2014) ("*Mosley*"), Nelson Decl. Ex. "C"; *see also* Jennings Expert Report in *Blue Ash Auto Body, Inc. v. Finney Auto. Co. Inc., et al.*, Case No. 12-cv-791816 (Ohio Court of Common Pleas) (Aug. 14, 2015) ("*Blue Ash*"), Nelson Decl. Ex. "D". Dr. Jennings acknowledged as much at his deposition in the Blue Ash matter.

> Q. Did you use other reports that you've generated for other cases in generating this report?
> A. Yeah. I drew some of the material from other reports?
> Q. What other reports?
> A. Oh, well, the report in the Moseley [sic] case and the report in Nick's Garage case.

Jennings Dep. in *Blue Ash* (Oct. 21, 2015) at 103:23-104:5; 258:1-5, Nelson Decl. Ex. "E"; *see also id.* at 261:24-262:2 ("Q. Well, the functional analysis [in your Report] is what is verbatim taken from other reports, correct? A. That's correct. Mostly verbatim.")

Because Plaintiffs' damages theory is fundamentally inconsistent with Dr. Jennings' Report, his Report is irrelevant and the Court should exclude it.

## V.   DR. JENNINGS' REPORT IS UNRELIABLE.

The reliability requirement enunciated in *Daubert* focuses on the methodology and principles that form the basis of an expert's opinion. This "entails a preliminary assessment of whether that reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. Furthermore, "it is critical that an expert's analysis be reliable at every step." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). Dr. Jennings' Report falls far short of meeting the Supreme Court's reliability standard because it does not satisfy any of the five so-called *Daubert* factors, relies on false assumptions, and is speculative and unsupported by the facts. Dr. Jennings' own behavior at depositions further undermines his reliability and the likelihood that he will help the trier of fact. For any of these reasons, the Court should preclude Jennings' Report.

### A.   Dr. Jennings' Report Does Not Meet Any Of The Daubert Factors.

The Supreme Court has set forth a number of factors for district courts to consider when evaluating expert testimony: (1) whether the expert's methodology can be or has been tested; (2)

whether the theory has been subject to peer review or publication; (3) the known or potential rate of error of a technique when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community.  *Daubert*, 509 U.S. at 593-95.  Dr. Jennings' auto body/mechanical labor rate comparison methodology does not satisfy any of these factors.

First, Dr. Jennings refused to state whether his theory has been tested (Jennings Dep. at 43:12–45:5, Nelson Decl. Ex. "A"), and later stated that his methodology could not be tested (*id*. at 197:17-198:5).  This is business-as-usual for Dr. Jennings, who conceded in *Blue Ash* that he did not test his hypothesis.  Jennings Dep. in *Blue Ash* at 11:17-12:8, Nelson Decl. Ex. "E" ("Q:  Did you conduct any experiments to prove or falsify the hypothesis in this matter? A: No. . . . I didn't do anything to prove or falsify any particular hypothesis.").  Dr. Jennings did nothing to test whether mechanical repairs and auto body repairs are sufficiently comparable, such that his use of the IRS intracompany tax methodology would yield a reliable result.  In determining that mechanical shops and auto body shops are economically comparable, Dr. Jennings claims to have looked at five factors cited in the IRS guidelines:  (1) functions performed; (2) risks assumed; (3) contractual terms; (4) economic conditions; and (5) property or services.  Jennings Report at 5, ECF No. 84-2.  There is no evidence, however, that Dr. Jennings conducted any such "examination."

Dr. Jennings' Report does not cite to a single source relating to either type of shop or the services they provide.  Dr. Jennings further conceded that he does not have first-hand knowledge or expertise about the repair shop industry generally, or Plaintiff specifically.  Jennings Dep. at 197:2-16, Nelson Decl. Ex. "A".  Moreover, although he purports to rely on the IRS's guidelines for his comparability analysis, Dr. Jennings failed to follow those very guidelines. Those guidelines state:

6

> Performing a functional analysis [of two separate economic activities or entities] involves more than a review of the books and records. It involves active interaction with the taxpayer. [This includes] interview[ing] the taxpayer's operational personnel most familiar with the taxpayer's operations[,] . . . conducting on-site visitations [to] . . . view the taxpayer's operations and functions performed . . . [and] identify[ing] the property, plant and equipment employed by the transacting parties.

IRS Audits Internal Revenue Manual, Part 4.61.3.5.1, Nelson Decl. Ex. "F". Dr. Jennings did not interview or visit Plaintiff or the mechanical shops surveyed by Abacus. Jennings Dep. at 72:6-12; 132:7-23, Nelson Decl. Ex. "A".

Second, Dr. Jennings concedes that his theory has not been subject to peer review or publication. Jennings Dep. at 198:13-15, Nelson Decl. Ex. "A" ("[T]his particular analysis has not been per reviewed by anybody in terms of my report."). The Stiroh Report confirms that Jennings' Report is deeply flawed in this and numerous other respects. *See generally*, Expert Report of Lauren Stiroh (May 23, 2014) ("Stiroh Report"), attached to Nelson Decl. Ex. "G".

Third, Dr. Jennings' Report does not address whether his auto body/mechanical labor rate comparison methodology has any known or potential rate of error. Jennings Dep. at 202:13-22, Nelson Decl. Ex. "A".

Fourth, and relatedly, there are no known standards or controls mentioned in the Jennings Report.

Finally, Dr. Jennings concedes that his auto body/mechanical labor rate comparison methodology is not generally accepted in the scientific community. *Id*. at 203:12-14. ("The specific application that I use those methods for is not something that I've seen someone else use yet."). This is enough to preclude Dr. Jennings' Report. *Meineker v. Hoyts Cinemas Corp.*, 154 F. Supp. 2d 376, 379-80 (N.D.N.Y. 2001) (excluding experts' opinions because the experts "formulate[d]

their own standards," lacked "sufficient specialized knowledge to assist the trier of fact," and did not rely on "existing, independent research") (citations and quotations omitted).

### B. The Report Is Speculative, Unsupported By Facts, And Relies On False Assumptions.

Courts in this and other Circuits have further expounded on *Daubert* and *Kumho*, holding that "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266. Furthermore, "one expert may not rely on another expert's opinion if the first expert is unfamiliar with the methods and reasons supporting the second." *U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 131 (S.D.N.Y. 2015). Dr. Jennings' conclusions are highly abstract, untested and unsupported by his peers, reliant on a host of erroneous, false, and unreliable assumptions and self-serving "facts." Dr. Jennings has shown in all of his cases that he relies on unverified assumptions as a matter of practice. *See, e.g.*, Jennings Dep. in *Blue Ash* at 117:12-16, Nelson Decl. Ex. "E" ("[T]hese are assumptions that I was asked to make and build my analysis on and I did not research or have – I do not have data specifically on that point to support that argument or that assumption at that moment."); *id*. at 118:9-11 ("I do not personally have any data that specifically supports these assumptions."). Any of Dr. Jennings' flawed assumptions, each inextricably woven into his report, renders his opinion unreliable and thus inadmissible.

#### i. The Abacus Survey is inherently flawed.

Dr. Jennings does not know whether Abacus interviewers were qualified to conduct the survey. Jennings Dep. at 135:4-8, Nelson Decl. Ex. "A". Dr. Jennings likewise did nothing to test whether the surveyed mechanical shops satisfy any of the other comparability factors discussed in his Report. *See, e.g.*, *id*. at 132:7-23; 134:10-136:3; 138:6-11. This is true despite numerous errors

evident in the Abacus survey.  *Id*. at 143:12-148:7.  Dr. Jennings simply assumed that the Abacus work was accurate, and accepted the survey results carte blanche.  *Id*. at 130:19-22.  An expert must do more.  Expert opinions based on unreliable data are themselves unreliable.  *Amorgianos*, 303 F.3d at 266.  Even a cursory review of the Abacus survey reveals that it is riddled with flaws.  *See* Jennings Dep. at 143:12-148:7, Nelson Decl. Ex. "A".

> **ii.     The Report assumes that Progressive unlawfully suppressed auto body labor rates.**

Dr. Jennings' opinions are based on a theory that "[a]uto insurers are able to influence their policyholders' decisions about where to send their crashed vehicles for ACR work, in spite of anti-steering laws that exist in almost every state."  Jennings Report at 2, ECF No. 84-2.  Dr. Jennings cites no evidence of this alleged industry-wide suppression, however, let alone evidence that Progressive itself engaged in any illegal rate suppression or other unlawful conduct.  Instead, Dr. Jennings simply assumes that the auto insurance industry, generally, imposes "low ACR rates . . . upon independent ACR shops."  *Id*. at 3.

When pressed as to what aspects of his Report refer to unlawful conduct by Progressive, Dr. Jennings claimed that the involvement of "auto insurers" in the damage appraisal process violates a federal consent decree entered by the Southern District of New York more than 50 years ago.  Jennings Dep. at 117:8-20, Nelson Decl. Ex. "A".  But this decree is not relevant to Progressive, which was not a party to the decree and which had hardly been in existence at the time the decree was entered.  *See* Order in *A&E Auto Body, Inc. v. 21st Century Centennial Ins. Co.* (Jan. 21, 2015) at 4 n.6 (M.D. Fla. No. 6:14-cv-310), Dkt. 291 ("[N]one of the parties in this case were parties to the 1963 case, and the Court does not find the 1963 consent decree to have any relevance to the instant case.").  Moreover, this decree does not even speak to the practices alleged in this case, but rather to violation of federal antitrust laws.  Dr. Jennings' failure to cite any evidence of unlawful

9

conduct by Progressive, let alone causally link any particular act by Progressive to his damages theory renders his Report and testimony inherently speculative and unreliable.

Dr. Jennings does not opine and cannot establish that: (1) Progressive suppressed the labor rate it paid for auto body work performed by Plaintiff to a level below market; (2) the auto body labor rate paid by Progressive is or was economically unreasonable; or (3) but for Progressive's actions, Plaintiff would have received a higher auto body labor rate. *See* Stiroh Report at 5-6, Nelson Decl. Ex. "G".

    **iii.**  **The Report assumes that auto body repair labor rates would equal mechanical rates in a "free and uncontrolled marketplace."**

Dr. Jennings further theorizes that "but for" the influence of auto insurers, the auto body labor rate paid to Plaintiff would equal or exceed the average posted mechanical rate in the region, as derived from the Abacus survey. Dr. Jennings does not explain the basis for his assumption that the auto body labor rates Progressive paid are not justified by market forces. Similarly, Dr. Jennings does not offer any evidence that the auto body labor rates Progressive paid to Plaintiff are below cost, or that Plaintiff lost money.

Dr. Jennings also failed to consider whether the economic conditions affecting auto body repair work (and therefore impacting the auto body labor rate) are sufficiently similar to the economic conditions affecting mechanical work. This failure is symptomatic of Dr. Jennings' Report, which fails to consider alternative causes for the difference between auto body and mechanical labor rates. "Although an expert need not rule out every alternative in forming an opinion, a factor that courts have considered in *Daubert* analyses is whether an expert has accounted adequately for obvious alternative explanations, which is appropriate because any theory that fails to explain information that otherwise would tend to cast doubt on that theory is inherently

10

suspect." *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 460 (S.D.N.Y. 2016) (internal quotations and citations omitted).

More fundamentally, Dr. Jennings' theory fails to differentiate between the lawful market influence of auto insurers on labor rates and the allegedly improper influence he has assumed in his Report. In the actual world, auto insurers play a vital role in the damage appraisal process by reducing the information disparity that exists between consumers and auto body repair shops. Most consumers are less knowledgeable about auto body repairs than auto insurance adjusters. Removing adjusters from the market would allow auto body repair shops to exploit the information disparity that exists between them and less informed consumers.

### iv. The Report assumes that the rates paid by Progressive are routinely lower than mechanical rates.

In forming his opinion, Dr. Jennings also assumed that "low ACR labor rates . . . are imposed upon independent ACR shops as a 'competitive market rate' despite that these independent shops are not privy to the sales benefits afforded to DRP shops, but rather are being deprived of those sales." Jennings Report at 3, ECF No. 84-2. This assumption is contradicted by the survey of posted mechanical rates upon which Dr. Jennings relies. Though Dr. Jennings claims that mechanical repairs are free of the influence of insurers, not all individual posted mechanical rates reflected in the Abacus Survey are higher than the individual rates paid by Progressive. *Id.* at 3.

### v. The Report assumes that Plaintiff would charge the same benchmark rate "but for" the influence of insurers.

Dr. Jennings' "but for" world also assumes that Plaintiffs would uniformly charge Dr. Jennings' benchmark rate—*i.e.*, the average posted rate of the shops included in the Abacus report—but for the influence of auto insurers. *Id.* at 3, 8-9. Setting aside the fact that Plaintiff does not seek to charge a mechanical labor rate for auto body repairs, Dr. Jennings ignores the fact that

11

the surveyed mechanical shops do not always charge their posted rate. *See* Abacus Report at 1-2, ECF No. 84-2.

Equally troubling, Dr. Jennings' assumption ignores the fact that the owner of the Plaintiff shop himself believes that mechanical repairs should be charged at a higher rate than auto body repairs. *See* Orso Dep. at 299:20-301:9, Nelson Decl. Ex. "B". The assumption also ignores the wide variance in the posted mechanical rates of the shops included in the Abacus survey.

### C.  Jennings' Application Of IRS Tax Methodology Governing International, Transborder, *Intra*company Transfers Is Inherently Unreliable.

It is black letter law that an expert cannot extrapolate from an accepted premise to an unfounded conclusion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). But that is precisely what Jennings does here. In reaching his opinion that auto body repair labor rates should equal mechanical repair rates in a world not "controlled" by auto insurers, Dr. Jennings relies on a comparison methodology lifted from IRS tax regulations promulgated under Section 482 of the Tax Code for evaluating international, cross-border intracompany transfers. Jennings Report at 4-5, ECF No. 84-2. On its face, this tax methodology has no application to different services or two different and separately owned companies such as Progressive and Plaintiff.

Section 482 of the Tax Code is "designed to prevent 'artificial shifting, milking, or distorting the true net incomes of commonly controlled enterprises.'" *Comm'r v. First Sec. Bank of Utah, N.A.*, 405 U.S. 394, 400 (1972). *See also* 42 U.S.C. § 482. The Code defines "controlled" entity as "any one of two or more taxpayers owned or controlled directly or indirectly by the same interests, and includes the taxpayer that owns or controls the other taxpayers." 26 C.F.R. § 1.482-1(i)(5).

Progressive and Plaintiff are not "owned or controlled directly by the same interests." *Id.* This fact alone makes the IRS's tax methodology inapplicable. Likewise, nothing in the statute or

12

regulations permits the application of the intracompany tax methodology to different types of goods or services such as mechanical and auto body repairs. *See* 26 C.F.R. § 1.482-1(d) (comparability standard generally); 26 C.F.R. § 1.482-9(c) (comparability standard for services). To the contrary, all of the examples included in the IRS intracompany cross-border regulations involve the same type of property or service. *See* 26 C.F.R. §§ 1.482-1(d)(3)(ii)-4(ii); 26 C.F.R. § 1.482-9(c)(4).

In a situation not involving an identical or virtually identical service, the regulations do not apply the IRS intracompany methodology because of its unreliability. *See* 26 C.F.R. § 1.482-9(c)(2)(ii)(A) ("[B]ecause even minor differences in contractual terms or economic conditions could materially affect the amount charged in an uncontrolled transaction, comparability under this method depends on close similarity with respect to these factors, or adjustments to account for any differences.") *See also* IRS Audits Internal Revenue Manual, Part 4.61.3.6, Nelson Decl. Ex. "F" ("Material differences with the controlled transaction reduced the comparability of the uncontrolled transaction.") Dr. Jennings has conceded that there are material differences between mechanical and auto body repair services:

> I don't feel like this a particularly controversial point . . . that I am making – making a point that leads to a conclusion that the auto collision repair work is more complex than auto mechanical repair work and therefore – and higher training requirements and higher risk and higher costs.

Jennings Dep in *Blue Ash* at 215:25-216:7, Nelson Decl. Ex. "E". Accordingly, Dr. Jennings' application of the IRS's comparison methodology to determine his benchmark "uncontrolled price" bears no indicia of reliability.

## VI.   DR. JENNINGS TESTIFIED FALSELY.

During his depositions in *Mosley* and *Blue Ash*, Dr. Jennings provided false testimony. Dr. Jennings' false testimony is troubling, and is reason alone to preclude him from testifying at trial.

For example, in the *Mosley* matter, Dr. Jennings provided untruthful testimony when questioned about his professional background.

> Q. Have you ever been terminated from any job?
> A. No.
> Q. Have you ever been refused tenure at any educational institution?
> A. No.
> Q. Have you ever been dismissed from any educational institution?
> A. No.

Jennings Dep. in *Mosley* at 212:3-11, Nelson Decl. Ex. "H".

Contrary to his sworn testimony, Dr. Jennings was dismissed and denied tenure from an educational institution earlier in his career. Dr. Jennings wrote two letters to the editor of "Vanguard," the student newspaper at Bentley University where Dr. Jennings was an Assistant Professor of Economics. Those letters contradict Dr. Jennings' sworn testimony.

In a letter dated March 5, 1987, Dr. Jennings wrote that the Bentley administration's comments "were in no way an explanation of my dismissal, but only described the process by which I was *fired*!" *See* Letters to the Editor Published in the Bentley College Vanguard ("Letters"), dated March 5, 1987 and April 16, 1987 at Bentley000006, Nelson Decl. Ex. "I" (emphasis added). In the same letter, Dr. Jennings writes that the Bentley administration "*dismissed* [him] for a lack of 'effectiveness' in [his] teaching"; that he was "offered no warning that there was a serious problem before [he] was *fired*"; that he "would challenge the basis of [his] *dismissal*"; and that he did "not know why [he] was *dismissed*." *Id.* (emphasis added); *see also* Letters at Bentley000007, Nelson Decl. Ex. "I".

Dr. Jennings was asked multiple straightforward questions about his own employment history, and he provided unequivocal answers. His answers were not truthful, as demonstrated by his own written words on the topic. Only when confronted with evidence of his own misstatements on the record did Dr. Jennings finally admit that he had been fired.

14

> Q. [In these letters] [y]ou are calling into question what you had been told as for the reason that you were being *terminated*, correct?
> A. Well, that's what seems to be implied by this letter, yes.

Jennings Dep. in *Blue Ash* at 29:6-10, Nelson Decl. Ex. "E" (emphasis added).

Dr. Jennings multiple misstatements during depositions are reason enough for the Court to preclude him from testifying at trial.

## VII. CONCLUSION

For all of the above reasons, the Court should preclude Plaintiff's use of the Report and opinion testimony of Dr. Jennings at trial.

Dated: New York, New York
       February 12, 2018

                                        Respectfully submitted,

/s/ Michael R. Nelson
Michael R. Nelson (Bar No.: 517554)
Kymberly Kochis (Bar No.: 517536)
Francis X. Nolan, IV (Bar No.: 517952)
**Eversheds Sutherland (US) LLP**
The Grace Building, 40th Floor
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 389-5000
Facsimile: (212) 389-5099
mikenelson@eversheds-sutherland.com
kymberlykochis@eversheds-sutherland.com
franknolan@eversheds-sutherland.com

*Attorneys for Defendants*
**Progressive Casualty Insurance Company,
National Continental Insurance Company,
Progressive Advanced Insurance Company,
Progressive Direct Insurance Company,
Progressive Max Insurance Company,
Progressive Northern Insurance Company,
Progressive Preferred Insurance Company, and
Progressive Specialty Insurance Company.**

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing Memorandum of Law in Support of Defendants' Motion to Exclude the Expert Report and Proposed Testimony of Frederic B. Jennings Jr., Ph.D., was electronically filed with the Clerk of the District Court using the CM/ECF system, which will send notification of such filing to all attorneys of record, on this 12th day of February, 2018.

/s/ Michael R. Nelson